Wiley L. BOLDEN et al.,
Plaintiffs-Appellees,

v.

CITY OF MOBILE, ALABAMA, et al.,
Defendants-Appellants.

Nos. 76–4210, 77–2042.

United States Court of Appeals,
Fifth Circuit.

March 29, 1978.

Wm. C. Tidwell, Charles B. Arendall, Jr., Mobile, Ala., Charles S. Rhyne, Washington, D. C., S. R. Sheppard, City of Mobile Legal Dept., Mobile, Ala., William S. Rhyne, Washington, D. C., Travis M. Bedsole, Jr., Mobile, Ala., Fred G. Collins, City Atty., Legal Dept. of the City of Mobile, City Hall, Mobile, Ala., Donald A. Carr, Martin W. Matzen, Washington, D. C., for defendants-appellants.

Gregory B. Stein, J. U. Blacksher, Larry Menefee, Mobile, Ala., Edward Still, Birmingham, Ala., Jack Greenberg, James M. Nabrit, III, Charles E. Williams, III, Eric Schnapper, New York City, for plaintiffs-appellees.

Dennis J. Dimsey, Atty., Civil Rights Div., Appellate Sect., U. S. Dept. of Justice, Washington, D. C., for United States.

Miriam R. Eisenstein, Brian K. Landsberg, Walter W. Barnett, Attys., Drew S. Days, Asst. Atty. Gen., Appellate Section, Civil Rts. Div., Dept. of Justice, Washington, D. C., for amicus curiae.

Before WISDOM, SIMPSON and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This is the second of four consolidated voting dilution cases we decide today. *See Nevett v. Sides (Nevett II)*, 571 F.2d 209, 213 n.1 (5th Cir. 1978). Black citizens of Mobile, Alabama, brought this class action to challenge the constitutionality of their

city's at-large method of electing its commissioners. The district court sustained the challenge, declared the city's commission government unconstitutional, and ordered the establishment of a mayor-council plan requiring that councilmen be elected from single-member districts. *Bolden v. City of Mobile*, 423 F.Supp. 384 (S.D.Ala.1976). The city and its commissioners take this appeal, asserting that the district court erred in its conclusion that the at-large commission elections impermissibly diluted the votes of black Mobilians and in its ordering of the single-member plan. We find the appellants' arguments unpersuasive and therefore affirm the judgment below.

The district court's opinion sets forth the factual background of this case in detail and at length. 423 F.Supp. at 386–94. Therefore, we will discuss only the salient findings below. We also incorporate the portions of our opinion of today in *Nevett II* that explicate the legal principles applicable to voting dilution cases.[1]

## I

A city commission consisting of three members, all of whom are elected at-large, governs the City of Mobile. Government by commission of this type was established in 1911 by state law, 1911 Ala.Acts no. 281, which requires commission candidates to run for numbered positions and win by majority vote. Commission elections are nonpartisan, and therefore there are no primaries. There is no requirement that commissioners reside in specified subdistricts.

In 1965, a specific city-wide function was assigned to each position by statute.[2] 1965

---

1. The *Nevett* opinion to which we refer is that of the second appeal in the case. We therefore denominate it *Nevett II*. The first appeal, *Nevett v. Sides (Nevett I)*, 533 F.2d 1361 (5th Cir. 1976), reversed a judgment for the plaintiffs and remanded the case to the district court. On remand, the court rendered judgment holding the at-large scheme constitutional. On the second appeal, we examined at length the principles that govern dilution cases and concluded that the district court's judgment for the defendants should be affirmed. To avoid needless repetition, we adopt in this case our prior discussion of the dilution principles. In particular, we incorporate Parts I and II of the opinion.

2. On May 14, 1975, approximately three weeks before the commencement of this action, the City of Mobile submitted several statutes of the 1971 Regular Session of the Alabama Legislature to the Attorney General of the United States for approval under § 5 of the 1965 Voting Rights Act, 42 U.S.C. § 1973c (1970). Among these statutes was Act 429, which amended the 1965 Act that assigned the specific functions to the commission positions, 1965 Ala.Acts no. 823. The Attorney General noted that Act 823 had not been tendered to him for approval under § 5, and he therefore requested that the Act be submitted.

On December 30, 1975, some seven months after the commencement of this action, the City of Mobile submitted Act 823 for the consideration of the Attorney General, although reserving the objection that the act was not subject to § 5 approval. The Attorney General interposed an objection to the Act's assignment of specific functions to the commission positions because it

locks the city into use of the at large system of electing [its] commissioners since it would not be appropriate to permit a particular area of the City (as under a ward system of election) to have the exclusive right to elect a commissioner who would be responsible for administering functions for the whole city, for example, public safety.

In view of this interpretation that [the provision] rigidifies use of the at large system, incorporating as it does the numbered post and majority vote features, and in view of history of racial discrimination and evidence of racial bloc voting in Mobile, we are unable to conclude, as we must under the Voting Rights Act, that [the provision] will not have the effect of denying or abridging the right to vote on account of race or color.

Letter from Assistant Attorney General J. Stanley Pottinger to C. B. Arendall, Jr., Special Counsel to the City of Mobile, at 2–3 (March 2, 1976), Record, vol. 2, at 479–80.

The city has not brought suit in the District Court for the District of Columbia, as provided by § 5, and therefore the function-assigning provision of Act 823 is in abeyance. As our subsequent discussion will show, the relevance of the Attorney General's objection is that it indicates the tendency of the function-assigning provision to perpetuate the at-large electoral system. The ultimate issue in this case is whether Mobile's at-large plan is being maintained with the design of diminishing black political input. The observation of the Attorney General constitutes circumstantial evidence that the legislature has recently and actively sought so to maintain the plan.

Ala.Acts no. 823. These functions include the administration of the following departments: the Department of Finance and Administration, the Department of Public Safety, and the Department of Public Works and Services. Commissioners are elected for four year terms, and the mayoralty is shared equally among the commissioners during their terms.

On June 9, 1975, the appellees commenced this action to invalidate Mobile's city commission. They claimed that the at-large feature of commission races combined with the various electoral devices set out above operated to dilute their votes in violation of the first, thirteenth, fourteenth, and fifteenth amendments to the Constitution, of the Civil Rights Act, and of the Voting Rights Act.[3] The case went to trial in July of 1976, and the district court entered judgment for the appellees on October 22, 1976, ordering that the next city elections, scheduled for August, 1977, conform with a yet-to-be-determined mayor-council plan incorporating single-member council seats.[4] The court entered a remedial order on March 9, 1977, abolishing the commission government and expounding a mayor-council plan. On April 7, 1977, however, the district court stayed its injunction that had ordered that the August elections conform to the mayor-council plan. We declined to dissolve this stay, and we stayed the holding of any city elections pending this appeal.

II

In concluding that Mobile's system of electing its city commissioners worked an unconstitutional dilution of the votes of black Mobilians, the district court relied upon the test set forth in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 294 (1976).[5] The court determined that the ap-

3. Specifically, the appellees alleged violations of 42 U.S.C. §§ 1973, 1983, and 1985(3) (1970). The district court dismissed the § 1983 claim against the city and § 1985(3) claims against both the city and the commissioners. The court did not rest its final decision on the merits on any of the remaining statutory claims, but found the plan unconstitutional under the dilution precedents of the Supreme Court and this circuit, to wit, *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 294 (1976).

Although we acknowledge the general principle that federal courts should avoid decision on constitutional grounds if an adequate statutory ground is available, *e. g., Wood v. Strickland*, 420 U.S. 308, 314, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Siler v. Louisville & Nashville R.R.*, 213 U.S. 175, 191, 29 S.Ct. 451, 53 L.Ed. 753 (1909), we will not upset the district court's judgment on this basis. "The doctrine is not ironclad," *Hagans v. Lavine*, 415 U.S. 528, 546, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), and to remand this fully litigated case would be a purposeless waste of judicial resources. The issue of constitutionality was fully developed at trial and, as the district court's thorough opinion evidences, was decisively determined in the appellees' favor under well established prece-

dents. The statutory claim was at best problematic; this court knows of no successful dilution claim expressly founded on 42 U.S.C. § 1973. Under similar circumstances, the Supreme Court has avoided an abusive application of the constitutional-decision-avoidance rule. *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 629, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584–85, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Moreover, a remand would not achieve the salutary objective of avoiding constitutional adjudication because we have already entertained the constitutional issues that govern this case in *Nevett II*. See note 1 *supra*. In *Nevett II* the complaint alleged no Voting Rights Act claim, and therefore we necessarily reached the constitutional issues. *See id.*, 571 F.2d at 213 n.3.

4. The court solicited single-member plans from the parties. The plaintiffs submitted plans pursuant to pretrial order, but the defendants declined to submit a plan. The court requested that the parties submit recommendations for a three-member committee, whose duty would be to devise a detailed plan. The committee was formed and submitted a lengthy mayor-council proposal. Supp. Record, vol. 1, at 628–675.

5. We have discussed at length in *Nevett II* the import of *Zimmer's* multifactor circumstantial evidence test for dilution. We incorporate that discussion here, and for the convenience of the

pellees established all the primary indicia of dilution except for the existence of a tenuous state policy behind the at-large plan. The evidence under the state policy criterion was found to be "neutral." 423 F.Supp. at 393. Under the enhancing criteria, the appellees demonstrated, and the court found, that Mobile is a large district (its 1970 population was 190,026, 35.4% of which was black), that the city has a majority vote requirement, that the commission candidates run for numbered positions, and that there are no subdistrict residency requirements. *Id.* at 393–94. We find the district court's determinations under the *Zimmer* criteria not clearly erroneous and the court's ultimate conclusion of dilution amply supported by its findings.

■ The district court gave careful consideration to each of the primary *Zimmer* criteria. It found a lack of black access to the political processes in Mobile. The court noted "massive official and private discrimination" prior to federal intervention in the form of the Voting Rights Act of 1965, 423 F.Supp. at 387, and found that although "[t]here are no formal prohibitions against blacks seeking office in Mobile . . . ," the local political processes are not equally open to blacks." *Id.* No black had achieved election to the city commission due, in part, to racially polarized voting of an acute nature. Few blacks sought office because of the prospect of certain defeat in the at-large elections. *Id.* at 389. Although the failure of black candidates because of polarized voting is not sufficient to invalidate a plan, *United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *McGill v. Gadsden County Commission*, 535 F.2d 277 (5th Cir.

1976); *Bradas v. Rapides Parish Police Jury*, 508 F.2d 1109 (5th Cir. 1975); *Robinson v. Commissioners Court*, 505 F.2d 674 (5th Cir. 1974), it is an indication of lack of access to the political processes. It is one piece of the circumstantial evidence puzzle, whose successful completion supports the illation of dilution. *See Nevett II*, 571 F.2d at 224.

■ The district court determined that the city commissioners have been unresponsive to the needs of blacks in Mobile. The city has employed relatively few blacks in the higher levels of city service, and the city has been enjoined by federal court order to desegregate its fire and police departments and to open city facilities to allow equal accessibility to blacks. Various city committees whose members are appointed by the commission have evidenced a severe underrepresentation of blacks. As the court concluded, "[n]o effort has been made to bring blacks into the mainstream of the social and cultural life by appointing them in anything more than token numbers." 423 F.Supp. at 390.

The court found not only that the city had been insensitive to the need for black participation in city government but also that the commission had been less responsive to black areas than white ones with respect to providing municipal services. These services included temporary relief from drainage problems, construction and resurfacing of roads, and construction of sidewalks. The court was careful to consider and weigh all the evidence.

Although the city has not been totally neglectful, and the expense and problems

reader we restate the criteria that *Zimmer* requires the district courts to consider in dilution cases. The criteria going primarily to the issue of dilution of a group's votes, the "primary" factors, include: the group's accessibility to political processes, the responsiveness of representatives to the needs of the group, the weight of the state policy behind at-large districting, and the effect of past discrimination upon the electoral participation of the group. *Zimmer*, 485 F.2d at 1305. Those criteria that may enhance the underlying dilution, the "enhancing" factors, include: the size of the district,

the portion of the vote necessary for election; if the positions are not contested for individually, how many candidates an elector must vote for (i. e., whether there is an anti-single shot rule); and whether candidates must reside in subdistricts. *Id.* "By proof of an aggregation of at least some of [the *Zimmer*] factors, or similar ones, a plaintiff can demonstrate that the members of the particular group in question are being denied access." *Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 143 (5th Cir.) (en banc), *cert. denied*, —— U.S. ——, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977).

are monumental, there is a singular sluggishness and low priority in meeting these particularized black neighborhood needs when compared with a higher priority of temporary allocation of resources when the white community is involved. 423 F.Supp. at 392. The court also made note of incidents of police brutality against blacks, mock lynchings, and cross burnings. The city commission reaction was found to be sluggish, evincing "a failure by elected officials to take positive, vigorous, affirmative action in matters which are of such vital concern to the black people." *Id.*

We think the evidence fairly supports a finding of unresponsiveness. The district court's task in considering evidence under the responsiveness criterion is a singularly factual one. Given the court's attentive consideration of the voluminous evidence on this issue, we cannot find its conclusion of unresponsiveness clearly erroneous. *See Nevett II*, 571 F.2d at 226.

As to the weight of the state policy behind at-large districting of city governments, the court found that the State of Alabama had no particular preference for such schemes.[6] Given the longstanding at-large feature of Mobile's commission government, however, the court concluded that the "manifest policy of the City of Mobile has been to have at-large or multimember districting." 423 F.Supp. at 393. We appreciate the traditional deference the federal courts have accorded local governments, and we recognize "that viable local governments may need considerable flexibility in municipal arrangements if they are to meet changing societal needs." *Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 1907, 29 L.Ed.2d 399 (1971). City-wide representation is a legitimate interest, and at-large districting is ordinarily an acceptable means of preserving that interest. *See Wise v. Lipscomb*, —— U.S. ——, 98 S.Ct. 15, 18, 54 L.Ed.2d 41 (1977), *recalling mandate and staying judgment of* 551 F.2d 1043 (5th Cir. 1977). But the longevity of Mo-

bile's at-large commission government cannot insulate it from review.

When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.

*Gomillion v. Lightfoot*, 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960); *accord, Robinson v. Commissioners Court*, 505 F.2d 674, 680 (5th Cir. 1974). We think the district court was warranted in finding that the city's interests in its at-large plan did not outweigh the strong showings by the appellees under the other *Zimmer* criteria. The aggregate of the evidence controls. *Zimmer*, 485 F.2d at 1305. Indeed, that the at-large plan has existed for over sixty-five years is wholly consistent with the court's ultimate conclusion that the plan has been maintained with the purpose of debasing black political input.

The district court found that the evidence under the last of the primary factors enunciated in *Zimmer*, whether "the existence of past discrimination in general precludes the effective participation [by blacks] in the election system," *id.*, preponderated in favor of the appellees. Blacks were effectively disenfranchised prior to the enforcement of the Voting Rights Act of 1965. A catena of federal litigation was necessary to overcome official recalcitrance in maintaining various impediments to black political participation. Although blacks are able freely to register and vote in Mobile today, the district court found that the vestiges of past discrimination "preclude the effective participation of blacks in the election system today in the at-large system of electing city commissioners." 423 F.Supp. at 393.

The district court was justified in resolving the issue of the effects of past discrimination against the appellants. It is not enough that the less subtle means of diminishing black participation have been re-

---

6. The court cited the elective nature of Ala. Code tit. 37, § 426 (Supp.1973), which was the subject of our opinion in *Nevett II, see id.*, 571 F.2d at 213–214 n.4, as evidence of the neutrality of Alabama's at-large policy. 423 F.Supp. at 401.

moved. As we admonished in *United States v. Texas Education Agency,* 532 F.2d 380 (5th Cir. 1976), *vacated and remanded on other grounds sub nom. Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1977), discriminatory official action is often clandestine and politic.

> Rather than announce his intention of violating antidiscrimination laws, it is far more likely that the state official "will pursue his discriminatory practices in ways that are devious, by methods subtle and illusive—for we deal with an area in which 'subtleties of conduct' . . . play no small part."

*Id.* at 388 (quoting *Holland v. Edwards,* 307 N.Y. 38, 45, 119 N.E.2d 581, 584 (1954)). Where, as here, past racial discrimination has been found to be pervasive and recent, it must be demonstrated "that enough of the incidents of the past [have] been removed, and the effects of past denial of access dissipated, that there [is] presently equality of access." *Kirksey v. Board of Supervisors,* 554 F.2d 139, 144–45 (5th Cir.) (en banc) (footnote omitted), *cert. denied,* —— U.S. ——, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977).

We need discuss only briefly the findings under the enhancing factors, since we have already outlined them. The electoral district, i. e., the City of Mobile, was found to be large; it is 142 square miles in area and had a population of 190,026 in 1970, 35.4% of which was black. The commissioners must be elected by majority vote, they run for numbered positions,[7] and they are not required to reside in subdistricts. Thus, the findings under all the enhancing criteria enumerated in *Zimmer* (or similar ones, see note 5 *supra*) have been in favor of the appellees. The only mitigating fact is the absence of primaries for the commission races. In the aggregate, the existence of these factors compounds what was already a strong showing of dilution under the primary criteria.

The bottom line of the *Zimmer* analysis in this case is that the black voters in Mobile have prevailed under each and every criterion, with the exception of a demonstration that Mobile's policy favoring at-large commission districts is a weak one. Moreover, the finding under the policy criterion, although perhaps not providing additional impetus to the appellees' case, is consistent with the court's conclusion that the plan was maintained for discriminatory purposes.

We conclude that the district court's findings are not clearly erroneous and that these findings amply support the inference that Mobile's at-large system unconstitutionally depreciates the value of the black vote. Under our holding of today in *Nevett II,* these findings also compel the inference that the system has been maintained with the purpose of diluting the black vote, thus supplying the element of intent necessary to establish a violation of the fourteenth amendment, *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and the fifteenth amendment, *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964). Although we have treated the subject of intent at length in *Nevett II,* a few additional remarks are appropriate.

### III

The city ardently asserts that since the 1911 plan was enacted under "race-proof" circumstances, it is immune from constitutional attack. Blacks had been effectively disenfranchised by the Alabama constitution in 1901, and therefore the at-large plan is said to have been adopted in a context where racial considerations could not have been relevant. *See Nevett II; McGill v. Gadsden County Commission,* 535 F.2d 277 (5th Cir. 1976). The city would have us interpret *Washington v. Davis* and *Arlington Heights* to require a showing of intentional discrimination in the enactment of the plan. We squarely reject

---

7. *See Nevett II,* 571 F.2d at 217 n.10.

this contention in *Nevett II,* as it was rejected by the en banc court in *Kirksey v. Board of Supervisors,* 554 F.2d 139 (5th Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). *Kirksey* held that an innocently formulated plan that perpetuates past intentional discrimination is unconstitutional. In *Nevett II,* we noted that a plan neutral at its inception may nevertheless become unconstitutional when it is maintained for the purpose of devaluing the votes of blacks. We also demonstrated that if the aggregate of the evidence under the *Zimmer* criteria indicates dilution, then the inference arises that the plan is being maintained with the requisite intent.

 The at-large scheme that has governed Mobile since 1911 is archetypal of the intentionally maintained plan we contemplated in *Nevett II.* The findings of the district court under *Zimmer's* circumstantial evidence test led the court to conclude that "[t]here is a 'current' condition of dilution of the black vote resulting from intentional state legislative *inaction* which is as effective as . . . intentional state action." 423 F.Supp. at 398 (emphasis in original). This, the district court held, was sufficient to support a finding of unconstitutionality. We agree.

Several additional facts buttress the court's inference that the at-large plan has been maintained with discriminatory intent. We mentioned above the 1965 act that assigned specific functions to the commission positions, 1965 Ala.Acts no. 823. See note 2 *supra* and accompanying text. The Attorney General, pursuant to the authority vested in him by section 5 of the 1965 Voting Rights Act, 42 U.S.C. § 1973c (1970), suspended the provisions of Act 823 that provided for specific functions. He found that the provisions tended to lock in the at-large feature of the scheme because it would be inappropriate for officials with city-wide responsibilities to be elected from single-member districts. See note 2 *supra.* This recent action by the Alabama Legislature is probative of an intent to maintain the plan by injecting additional policy grounds that

would justify, and perhaps insulate, the at-large feature of all of the commission seats.

The enactment of Act 823 gains additional significance when combined with the court's finding that the legislature was acutely conscious of the racial consequences of its districting policies. As the court found, "[t]he evidence is clear that whenever a redistricting bill of any type is proposed by a county delegation member, a major concern has centered around how many, if any, blacks would be elected." 423 F.Supp. at 397. This finding constitutes direct evidence of the intent behind the maintenance of the at-large plan. *See Arlington Heights,* 429 U.S. at 268, 97 S.Ct. 555. It coincides with the conclusion of intentional discrimination that flows from the circumstantial evidence adduced under the *Zimmer* criteria in this case. We think that the district court has properly conducted the "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" that a court must undertake in "[d]etermining whether invidious discriminatory purpose was a motivating factor" in the maintenance or enactment of a districting plan. *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564.

### IV

 The remaining issue is the appropriateness of the district court's remedy. The court ordered the implementation of a mayor-council plan that established nine single-member council districts. The appellants contend that the court's order is violative of the tenth amendment, which provides as follows: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S.Const. Amend. X. We find this contention meritless.

The essence of the appellants' argument is that the district court, having found the city's at-large government unconstitutional, is powerless to remedy the violation. The city refused to come forward with a plan, forcing the district court to fashion a remedy. The district courts have been repeated-

ly admonished by the Supreme Court to avoid the employment of at-large seats in their remedial plans, unless some special circumstance requires that such seats be used. *E. g., East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976); *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Connor v. Johnson,* 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). The absence of any special circumstances in this case left the district court with the remedy of implementing a single-member plan.

The exercise of the equitable power of the district court in remedying the unconstitutional infirmity in Mobile's commission plan does not contravene the tenth amendment. We have recognized the importance of flexibility in the form of local government, but flexibility is not absolute license. The abuse of local governmental power, when of the constitutional magnitude in this case, is a power "denied the States" by the Constitution within the meaning of the tenth amendment. The power to remedy the unconstitutional wrong is one "delegated to the United States by the Constitution." The Constitution expressly provides for federal court jurisdiction in claims "arising under this Constitution [or] Laws of the United States." U.S.Const. art. 3, § 2. Congress has given the federal courts original jurisdiction over such claims. 28 U.S. C.A. § 1331 (West Supp.1977). Cases alleging unconstitutional infringement by a state of the right to vote are justiciable under the fourteenth amendment, *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), as are cases asserting a violation by local governments, *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). "The Equal Protection Clause reaches the exercise of state power however manifested, whether exercised directly or through subdivisions of the State." *Id.* at 479, 88 S.Ct. at 1118. Claims asserting abridgment of the right to vote on account of race were justiciable even before the advent of the reapportionment era ushered in by *Baker.* It was the racial gerrymander of the City of Tuskegee, Alabama, that was the subject of the fifteenth amendment claim in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). A concomitant to the ability of a court to hear a case is that it be able to decide the case and remedy a wrong, if found.

> Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.
>
> . . . . As with any equity case, the nature of the violation determines the scope of the remedy.

*Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

The appellants refused to submit a plan; they cannot by their recalcitrance straightjacket the district court. We think the remedial plan adopted by the court was within its equitable powers. The plan is a temporary measure. It will exist only until the state or the city adopts a constitutional replacement.

Having found the district court's resolution of the constitutional issues in this case to be correct, and having approved its remedial measures, we find the disposition below proper in all respects. Therefore, the judgment of the district court is AFFIRMED. The injunction of the district court ordering that elections be held in conformance with its order is hereby REINSTATED, and our stay of the conducting of municipal elections is hereby DISSOLVED.

AFFIRMED.

WISDOM, Circuit Judge, specially concurring:

I concur specially for the reasons stated in my concurring opinion in *Nevett v. Sides (Nevett II),* 571 F.2d 209, with which this case is consolidated.