T. J. HENDRIX, George Walker, Johnie Mabry, L. D. Chapman, Willie Tuggle, Joe Artis, Rebecca Urquhart, and Catherine Harris, Individually and for all others similarly situated, Plaintiffs,

v.

H. B. McKINNEY, Individually and in his official capacity as Chairman of the Montgomery County Commission, William F. Joseph, Jr., Nancy Cox, Mack McWhorter, and Cleavy T. Johnson, Individually and in their official capacities as members of the Montgomery County Commission, Montgomery County Commission, Walker Hobbie, Jr., Individually and in his official capacity as Probate Judge of Montgomery County, William Baxley, in his official capacity as Attorney General of the State of Alabama, Defendants.

Civ. A. No. 74–264–N.

United States District Court,
M. D. Alabama, N. D.

Nov. 15, 1978.

John L. Carroll, Morris S. Dees, and Howard A. Mandell, Montgomery, Ala., for plaintiffs.

Jack Crenshaw, Crenshaw & Minor, and Mark Anderson, Montgomery, Ala., the Montgomery County defendants.

William J. Baxley, pro se, and Samuel A. Beatty and Winston T. Lett, Asst. Attys. Gen., State of Alabama, Montgomery, Ala., for Baxley.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHNSON, Chief Judge.

Plaintiffs, for themselves and as representatives of all blacks eligible to vote in Montgomery County, complain that the at-large election system for members of the Montgomery County Commission unconstitutionally dilutes the black vote. Defendants are the county commissioners, Montgomery County Probate Judge Walker Hobbie, Jr., and State Attorney General William Baxley. All are sued in both their individual and official capacities except

William Baxley, sued only as Attorney General of the State of Alabama.

Plaintiffs seek relief under 42 U.S.C. §§ 1983 and 1985(1)(3). This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(3)–(4), and 2201. On February 26, 1976, the Court issued its opinion finding the county's at-large system unconstitutional. The formulation of a remedy was stayed pending appeal. The Fifth Circuit remanded the case for more detailed findings in light of the doctrinal developments in *David v. Garrison*, 553 F.2d 923 (5th Cir. 1977). *Hendrix v. Joseph*, 559 F.2d 1265 (5th Cir. 1977). Subsequent cases have further defined the analysis to be followed by the district court. *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978); *Bolden v. City of Mobile*, 571 F.2d 238 (5th Cir. 1978); *Blacks United for Lasting Leadership v. City of Shreveport*, 571 F.2d 248 (5th Cir. 1978). In reliance upon these authorities and upon consideration of the briefs of the parties, the exhibits, and the evidence submitted at trial and on remand, the Court determines that plaintiffs are entitled to relief.

## I. Discriminatory Purpose in the Enactment of Act 685

Before this Court in 1975, plaintiffs attempted to show no more than that the at-large election scheme, while "neutral at its inception,"[1] had been maintained for the unconstitutional purpose of devaluing the votes of blacks. On remand, however, plaintiffs have developed further evidence surrounding the enactment of the at-large scheme in 1957. The evidence demonstrates that the at-large scheme enacted by the Alabama legislature in 1957 was not racially neutral. Not since 1875 had Montgomery County elected commissioners at large. For thirty-two years, until 1907, the governor appointed the county commissioners. Then for fifty years, Montgomery County operated under a plan whereby two commissioners were elected from single districts and three commissioners from a third district. The two single districts were located in the rural, southern part of the county. The three-member northern district encompassed the City of Montgomery. While the black population for the county is approximately 36 percent, blacks constitute a majority in the two southern districts, as they did in 1957. Both plaintiffs and defendants acknowledge that the plan was malapportioned. Residents in the two southern districts, although constituting less than 10 percent of the county population, elected 40 percent of the county commission. Yet the evidence as now presented reflects that that fact played very little, if any, part in the change to an at-large plan.

Act 685 of the Alabama legislature converted Montgomery County to the at-large system. The Act, however, did not mention Montgomery County by name. Rather the Act was worded to apply to counties having a population of not less than 125,000 nor more than 225,000. The only county fitting that definition was Montgomery County. That remained the case until the 1970 census revealed that Madison County, with a population of 186,540, was for the first time covered by the Act. The legislature responded in 1971 by amending Act 685 to limit it to counties having a population greater than 150,000 but less than 180,000. With a population of 167,790, Montgomery County remained the only county affected by Act 685. As the Court of Appeals noted with considerable understatement, "[T]he vigilance exercised by the legislature to guarantee that the act . . . remains limited to Montgomery County is rather curious." *Hendrix v. Joseph*, 559 F.2d at 1270.

As disclosed by the new evidence submitted on remand, the vigilance of the legislature is attributable to its desire to guarantee that no black commissioners would be elected from the southern districts of Montgomery County. Congress provided the "inspiration" for this particular narrative. On July 18, 1957, the House of Representatives passed the Civil Rights Act of 1957. On August 7, the Senate passed a different version of the Act. A joint committee met to reconcile the two versions and reported a

---

1. *Bolden v. City of Mobile*, 571 F.2d 238, 246 (5th Cir. 1978).

compromise less than three weeks later. The House reenacted the bill on August 27, followed by the Senate on August 29. As passed, the 1957 Civil Rights Act enhanced federal authority to halt discrimination in voter registration. The Act prohibited any interference by intimidation, threat, or coercion with the right of any person to vote, and, toward that end, empowered the Attorney General to institute an action to enjoin any such attempts.

Act 685 was introduced in the Alabama legislature on August 18, 1957. The Alabama House passed the Act on August 27; the Senate approved on September 20. The timing of Act 685 was more than coincidence. The Alabama legislature was receiving daily reports on the progress of the 1957 Civil Rights Act through Congress. Prior to its passage, the Alabama legislature passed resolutions condemning it and praising those senators and representatives who opposed it. Legislators prepared to thwart black majorities by racial gerrymanders even before the blacks became registered. The Alabama legislature established a committee to abolish Macon County, whose population was 90 percent black. One member of the committee acknowledged the obvious; their purpose "was to maintain segregation at that time." Only merging Macon County into the surrounding counties, it was recognized, would preclude blacks from being elected to public office, including the Macon County Commission.

Joe Dawkins was a member of the legislative committee to abolish Macon County. Significantly, he was also the sponsor of Act 685. As he testified in this case, Act 685 was "solely [his] idea." An examination of his record leaves little doubt as to his motivation. In his deposition, Dawkins denied any activity in support of segregation, "not even in a position of a resolution," except his participation on the Macon County abolition committee. He attempted to downplay even that association, saying that he discouraged the idea from the beginning. His appointment to the committee, however, strongly suggests that he supported the proposal. The house journal

bears out this inference. It shows that Dawkins must have been a floor leader for the legislation that passed the House concerning Macon County. He introduced in place of an earlier proposal the version of the constitutional amendment ultimately adopted by the House. It was also Dawkins who successfully moved to table amendments that would have changed his proposal.

The record shows that Dawkins maintained a stance of consistent hostility to civil rights. In 1957 alone, Dawkins voted "yes" on fourteen prosegregation bills or resolutions. Senate Joint Resolution 9 commended Alabama's senators and representatives for their efforts against the 1957 Civil Rights Act. Senate Joint Resolution 58 applauded as "patriots and lovers of liberty" those who were fighting the "iniquitous and infamous civil rights bills." Dawkins cast his vote in favor of the latter resolution only one month before he introduced Act 685. Dawkins was not embarrassed by his record of opposition to civil rights. Two days before the election of 1958, his newspaper advertisements touted in bold print his active legislative support for "SEGREGATION."

Dawkins represented Montgomery County in the legislature beginning in 1951. He was familiar with the efforts of black leaders to register blacks in Montgomery County as early as that year and up until 1957. Although few blacks were registered in 1957, Dawkins knew that blacks outnumbered whites in the two southern districts of the county, and he was well aware of the implications of the Civil Rights Act of 1957. Defendants ask the Court to disregard this evidence of motivation because Dawkins was not really prejudiced; as an Alabama politician, he "more or less had to be in support of States' Rights and separate but equal facilities." Defendants argue that Dawkins enjoyed the support of black leaders; that they knew he was not anti-black, and that, on at least two occasions, he had voted for them. The footnotes in defendants' brief reveal, however, that the only support for these assertions is a paid adver-

tisement by Dawkins' opponent in 1958, Alfred W. Goldthwaite. The ad declares, "Alfred W. Goldthwaite does not solicit and does not want the Negro Bloc Vote," and concludes, "Alfred W. Goldthwaite will not 'kowtow' to the Negro bloc vote." Assuming that evidence of black support for Dawkins would counter the evidence of his racial motivation in introducing Act 685, the race-baiting of a political opponent hardly constitutes proof of such black support. Defendants' rebuttal is no more persuasive in asserting that the motivation for Act 685 was to prevent vote buying. Rumors of vote fraud in southern Montgomery County had existed since the close elections for commissioner in 1948. There is no evidence that anyone treated the rumors as a serious matter. No charges had been filed; no investigation conducted; no prosecution initiated. Indeed, Dawkins was first elected in 1951. If Act 685 was designed to discourage vote buying, why did he wait almost a decade after the election of 1948 to introduce it? The intervening elections did not enhance, but considerably diminished, the significance of the rumors. In 1952, the incumbent commissioner from the southeastern district ran unopposed. The winner in the southwestern district enjoyed a comfortable margin of victory. In 1956, both candidates ran unopposed. Defendants argue that the danger of vote-buying remained great because the number of registered voters in those two districts remained small. But the goal of the 1957 Civil Rights Act was to boost the number of black voters. If anything, passage of the Act lessened the risk of vote-buying in future elections. The advent of Act 685 ten days after the Senate's initial approval of the 1957 Civil Rights Act is thus all the more suspect.

The Fifth Circuit has held that "a plan neutral at its inception may nevertheless become unconstitutional when it is maintained for the purpose of devaluing the votes of blacks." *Bolden v. City of Mobile*, 571 F.2d at 246. In *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd sub nom., East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47

L.Ed.2d 296 (1976), the Court set forth criteria, later elaborated in *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978) ("Nevett II"), to determine whether the requisite discriminatory intent is involved in the perpetuation of a particular districting plan. "[T]he search for improper motivation does not end at the enacting stage." *Nevett II*, 571 F.2d at 221; *Thomasville Branch of the NAACP v. Thomas County*, 571 F.2d 257 (5th Cir. 1978).

■ But the search for improper motivation does begin at the enacting stage. The Fourteenth Amendment brooks no contrivances, as at-large schemes may be, that are "conceived . . . as purposeful devices to further racial or economic discrimination." *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). Likewise the Fifteenth Amendment condemns legislation designed with the intent to infringe the voting rights of black citizens. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Nevett II*, 571 F.2d at 220–21. This Court has previously found that blacks constitute a minority of Montgomery County, but a majority of its two southern districts. Moreover, voting to a substantial degree remains polarized by race. The effect of an at-large election system in combination with the minority status of blacks and the social pattern of racially polarized voting is a dilution of black voting strength. *Nevett II*, 571 F.2d at 222. The effect of Act 685 is clear. Where discriminatory impact is plain, the courts have not hesitated to examine the motive behind the act. *Griffin v. County School Bd.*, 377 U.S. 218, 231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Gomillion v. Lightfoot, supra; Smith v. Paris*, 257 F.Supp. 901 (M.D.Ala.1966), *aff'd per curiam*, 386 F.2d 979 (5th Cir. 1967); *Sims v. Baggett*, 247 F.Supp. 96 (M.D.Ala.1965); *Bush v. Orleans Parish School Board*, 187 F.Supp. 42, 45 (E.D.La.1960), *aff'd mem.*, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961). This principle was reaffirmed in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Judicial deference, the

Court declared, is particularly inappropriate where racial discrimination is a motivating factor in a legislative decision.

■ This Court has therefore examined the evidence concerning the motivation for Act 685. The Court concludes that Act 685 was conceived as a device to dilute black voting strength, had the intended effect, and is therefore unconstitutional. The Court does not find that racial discrimination was necessarily the sole motive. But "[*Washington v.*] *Davis* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)] does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563. The Court does find that illicit racial motives were a significant factor in the enactment of Act 685.

In so finding, the Court is not faced with the usual problem of reading the motive of each legislator in order to infer the collective "motive" of the legislature. It is common knowledge that the Alabama legislature observes a courtesy rule whereby it perfunctorily approves all county legislation unanimously endorsed by the county delegation. In this case, then, the Court need not and does not attribute an illicit racial motive to every legislator voting in favor of Act 685. The proper focus is on the Montgomery County delegation. There is no evidence that any member objected to Dawkins' proposal. Thus, Dawkins' intent is indicative of the Act's purpose in 1957 and is determinative now of the Act's unconstitutionality.

In *Arlington Heights*, the Supreme Court described the kinds of evidence from which an invidious discriminatory purpose might be inferred. Discriminatory impact is "an important starting point." 429 U.S. at 266, 97 S.Ct. 555. As explained above, an at-large voting scheme has such an impact where blacks are in the minority and where voting historically has been racially polarized. The historical background of the discriminatory decision is a second evidentiary source. Such evidence in large part sustained the conclusion of the Court in *Sims*

*v. Baggett* that the Alabama legislature had created multi-county, multi-member districts "for the sole purpose of preventing the election of Negroes to House membership." 247 F.Supp. at 109. The pattern and practice of discrimination in Alabama to which the Court referred in that case is no less a backdrop to Act 685. *Sims* after all, was decided in 1965. When it spoke of Alabama's "long history of racial discrimination," it was referring in part to the legislative defiance of 1957. *Id.*

A third source of evidence as to motive may be the "specific sequence of events leading up the challenged decision." *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564. The example propounded by the Supreme Court of a suspect sequence is strikingly similar to the sequence here. The Court stated that it would have had a far different case if "the property involved here always had been zoned R–5 but suddenly was changed to R–3 when the town learned of MHDC's plans to erect integrated housing." *Id.* Analogously, Montgomery County had for fifty years elected two commissioners from single-member districts. The legislature suddenly switched the county to an at-large scheme when it learned that Congress had passed the 1957 Civil Rights Act. The sequence behind Act 685 resembles not only the Supreme Court's hypothetical but also the events in *Smith v. Paris*, in which this Court invalidated the at-large election plan for members of the Barbour County Democratic Executive Committee. With the passage of the Voting Rights Act of 1965, the blacks in Barbour County registered in large numbers and, for the first time, qualified candidates to run for the Executive Committee. Just weeks after their qualification and little more than a month before the election, the Committee, with little or no debate, promulgated an at-large scheme for all committee positions. An inference of discriminatory purpose, this Court found, was "compelling." *Id.* at 904. The same inference is no less compelling here simply because Dawkins did not wait to see if the 1957 Civil Rights Act would, in fact, increase black registration and produce black candidates.

The Supreme Court in *Arlington Heights* also noted that departures from the normal procedural sequence or substantive departures might afford evidence of improper purpose. There is no evidence of procedural irregularities in the passage of Act 685. Act 685 is, however, substantively anomalous. If Dawkins was concerned in 1957 that the small voting populations in the southern districts of the county facilitated vote buying, no explanation has been offered why the district boundaries were not re-drawn. Alternatively, if race was not a factor in Dawkins' decision, why did he not wait to determine what effect the 1957 Civil Rights Act would have on black voter registration? On the other hand, if an at-large plan was truly advantageous, why did he require that commissioners reside in and represent one of the old districts? The result, as the Court reasoned in *Smith v. Paris*, was "to perpetuate the old system of population disparity with the anomalous twist that predominantly Negro beats now have their representatives determined for them by the predominantly white majority of voters in the county as a whole." 257 F.Supp. at 905. This quality of Act 685 requires an inference of improper motive.

Finally, the opinion in *Arlington Heights* suggests that legislative history may be highly relevant. While the history of Act 685 is sparse, the history of the legislative session in which it was passed reveals that Dawkins and his colleagues were vigilantly manning the barricade of segregation. Contemporaneous statements about the Act are lacking; but the subsequent explanations tendered by various defense witnesses are unconvincing. In this case, the obvious explanation of the Act's origins and purpose is also the best explanation.

Applying the analysis articulated in *Arlington Heights* to the facts in this case, the Court thus finds that Act 685 was motivated in significant part by a desire to dilute potential black voting strength. Act 685 thus runs afoul of the Fourteenth and Fifteenth Amendments. The passage of twenty-one years does not filter out the impure motive nor render the Act any less tainted.

These findings and conclusions constitute an independent ground for judgment in favor of plaintiffs. The Court further finds, however, that even if this evidence of illicit motive did not exist, judgment for plaintiffs should be granted based upon an application of the criteria first articulated in *Zimmer v. McKeithen*. That analysis is set forth below.

II. *Discriminatory Purpose in the Maintenance of Act 685*

■ The law is clear that a voting plan, racially neutral at its adoption, may nevertheless violate the Fourteenth and Fifteenth Amendments. A plan intentionally maintained for discriminatory reasons is unconstitutional. *Nevett II*, 571 F.2d at 221. To aid in determining whether the requisite discriminatory intent exists, the Fifth Circuit in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), set forth a number of relevant factors. This Court relied on those factors in formulating its memorandum opinion of February 26, 1976. Subsequently, the Fifth Circuit refined and further articulated the *Zimmer* criteria, distinguishing a category of "primary factors" from a second category of "enhancing factors." *Nevett II*, 571 F.2d at 217; *David v. Garrison*, 553 F.2d 923 (5th Cir. 1977). The Court addresses below each of these factors and makes the appropriate findings. The findings do not all cut the same way, but in the aggregate support the conclusion that the at-large scheme in Montgomery County has been maintained to exclude full political participation by the black community.

A. Slating

The core of the inquiry as to slating is the ability of blacks to get on the ballot. Today, formal prohibitions no longer prevent blacks from seeking county office. There are no screening organizations or petition requirements. Blacks now register and vote. But barriers remain even after the obvious legal roadblocks have been removed. Not only have no blacks been elected to the County Commission, none have run. None have sought any county-wide

office. Two blacks have been elected from Montgomery County to the legislature. But both ran from single-member districts created by court-ordered reapportionment. *Sims v. Amos*, 336 F.Supp. 924 (M.D.Ala.) *aff'd* 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972). Before reapportionment, state legislators ran from the county at large, and under that method no blacks were elected. As the Court found before, voting in Montgomery County follows racial lines. This fact undoubtedly discourages black candidates because they face the certain prospect of defeat. While courts in previous voting dilution cases have often found that no blacks have been elected, rarely has it been true that no blacks have even run. *Nevett v. Sides*, 571 F.2d at 226; *David v. Garrison*, 553 F.2d 923, 925 (5th Cir. 1977); *Paige v. Gray*, 538 F.2d 1108, 1109 (5th Cir. 1976); *Bolden v. City of Mobile*, 423 F.Supp. 384, 388 (S.D.Ala.1976), *aff'd*, 571 F.2d 238 (5th Cir. 1978). Where black candidates are as effectively deterred as they are in Montgomery County, it can hardly be said that the candidate selection process is open.

There is another important set of factors that speak to the black community's degree of access to the political process. The Fifth Circuit in *Kirksey v. Board of Supervisors*, 554 F.2d 139, 145 (5th Cir.) (en banc), *cert. denied*, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977), stated:

> The Supreme Court and this court have recognized that disproportionate education, employment, income level and living conditions tend to operate to deny access to political life. . . . It is not necessary in any case that a minority prove such a causal link. Inequality of access is an inference which flows from the existence of economic and educational inequalities.

The Court specially noted that under *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the question of minority access to the political process cannot be narrowly equated with access to the ballot or voting booth. *Kirksey*, 554 F.2d at 143. Montgomery County's blacks are marked by that "depressed socio-economic status which makes participation in the community process difficult." *Id.* Census data discloses that of persons in white-majority tracts, 67.3 percent graduated from high school compared to 28.1 percent in black-majority tracts. While 16.3 percent of whites hold college degrees, the figure for blacks is only 6.4 percent. The living conditions of blacks are also poorer. Of those in white tracts, 64 percent own their homes compared to 38.4 percent in black tracts. Eleven percent of the homes in black areas lacked some or all plumbing facilities compared to 2.7 percent in white areas. Thirty-seven percent of black-area homes were built before 1940; only 18.6 percent for white areas. More significantly, the mean family income in white areas is almost double that for black areas, just as black unemployment is nearly double that of white. Thirty-five percent of black-area families are below the poverty level as compared to 7.9 percent of white-area families. These statistics strongly suggest that access to the political process is not equal.

### B. Responsiveness

The evidence taken on remand indicates that the County Commission's relationship to the black community is one of unilateral token gestures. Commissioners may campaign for the black vote, but the Commission's performance suggests they believe black citizens can be treated "unequally with impunity." *Hendrix*, 559 F.2d at 1269. One significant symptom of that attitude is discrimination in hiring. The evidence today reveals much the same situation that caused the Commission to be placed under court order. *Sims v. Montgomery County Commission*, Civil Action No. 3708–N (M.D. Ala. March 22, 1973). While the percentage of blacks employed has increased, they remain assigned for the most part to low paying and unskilled positions. Defendants contend that, despite this slow progress, the Commission is in compliance with the court order. Compliance, however, does not necessarily prove responsiveness. The fact that the Commission continues to operate under court order proves the contrary. Moreover, it appears that after issuing a

resolution in June, 1973, calling upon all departments to follow a racially neutral policy, the Commission has made only the most perfunctory checks to see that the policy is being adhered to and the court order complied with.

More striking is the significant underrepresentation of blacks in appointments by the Commission. At the time of the original trial, there were 61 appointees, 56 of whom were white and 5 black. Of the 62 appointments made since the suit was filed, 50 were white and 12 black. The result is that, as of November 15, 1977, there were 63 white appointees and 13 black. Black appointments thus account for only 17.1 percent of the overall total. The number of black appointments is so few that no blacks are members of the county's delegation to the Planning & Development Commission, the Plumber's Board, the Recreation Board, the Community Action Committee, the Library Board, the Personnel Board, or the Mental Health Authority. The underrepresentation is all the more indicative of unresponsiveness in that 9 of the 13 black appointments are on two boards, both subject to federal guidelines prohibiting discrimination in their make-up. As a result, blacks have been excluded from meaningful participation in the county's political affairs.

The reasons offered for this numerical discrepancy are as significant as the discrepancy itself. Three commissioners testified that it was difficult to find anyone, black or white, to volunteer for the various unpaid board positions. But the evidence reflects that the Commission had greater difficulty finding blacks. This may be explained by the fact that the commissioners lack the most elemental contacts with the black community. William F. Joseph, Jr., former chairman of the Commission and commissioner for thirteen years, testified that he had never contacted any black for the names of persons who might be interested in filling an appointive position. That occurred, he suggested, "from a lack of my knowing many blacks." But a second explanation is that when black candidates were tendered, they were ignored. Mr. H. B. McKinney, a commissioner and chairman of the Commission since 1976, testified that a black minister had once contacted him about an appointment. McKinney did not recall the Board involved, the name of the person recommended, or whether that person was ultimately appointed. McKinney never contacted the black minister again or any other black. He has never recommended a black for a county appointment. Mr. Joseph testified that he was sure there were many blacks interested in recreation who would have qualified to serve on the Recreation Board. "I am simply saying," he related, "that at that time the Commission did not see fit to put them on there." Simply stated, the Commission has made appointments by conferring with friends and acquaintances, a community that happens to be all white.

It can safely be concluded that commissioners who are so oblivious to the black community are secure in their positions. If they are insecure, it is not because of the black vote. The commissioners appear to lack even the formal political contacts that would certainly exist if the black vote were considered important. It should be axiomatic in a democratic society that a governing body without such ties cannot be responsive.

In the area of government services, the Commission's record of responsiveness is a mixed one. While no services are completely withheld from the black community, neither are they equally provided.

Plaintiffs presented no evidence concerning bridge and road maintenance, flood control, health care, and law enforcement. As to bridge and road maintenance, that failure stems in large part from the lack of any reliable means of measuring such maintenance. Instead, plaintiffs evaluated the county's road paving program, discussed below. There being no evidence about flood control measures, the Court assumes that such measures, if any, have been taken without regard to race. Health care presents problems of attribution; the county has no health service employees, but contributes to the Montgomery County-City

Health Department, whose employees are on the state payroll. There is no evidence from which to make findings about the Department's care, assuming that the county has direct responsibility in that area. Law enforcement is also an area of ambiguous county responsibility. While the Commission budgets the Sheriff's Department, the Sheriff is elected county-wide and is not politically accountable to the Commission.

That the Commission lacks legal authority to control the Sheriff does not mean that it lacks influence. There is no evidence, however, that the Commission has exercised that influence to represent the interests of its black constituents. In 1974, there were two black deputies at ranks I and II and 38 such white deputies. Three years later the totals were seven black and 56 white deputies. There are no blacks among the seven deputies with supervisory rank. Likewise, the Commission has failed to exercise its influence to prohibit racial discrimination by the county jury commission in the compilation of its jury rolls. *See Penn v. Eubanks*, 360 F.Supp. 699 (M.D.Ala.1973). There can be little doubt that a commission responsive to the black community would have been less passive and more diligent in its supervision.

One area in which the Commission does exercise direct responsibility and expends a substantial portion of its budget is road construction and paving. The county maintains 566 miles of county roads, of which 252 miles are paved. A survey of every household along all county roads revealed that in 1974, at the time this lawsuit was filed, 73.3 percent of the households along unpaved roads were black, while 70.1 percent of the households along paved roads were white. Translated in terms of black citizens rather than black households, the figures reveal an even greater discrepancy.[2] Events during the past three years have not materially changed the situation and do not warrant a different conclusion. The evidence reveals that since 1974, the county has paved 56 miles of roads and that 82

percent of the households along those roads are black. Plaintiffs argue that this effort, made under the threat of legal action, substantiates the claim of unresponsiveness. The Court takes notice, however, that the initiation of this lawsuit coincided with the county's acquisition of its own road building equipment, which permitted it to do more paving at a lower cost. While this may explain the county's sudden burst of road building activity, it does not rebut the presumption claimed by plaintiffs that recent paving projects were selected with an eye to this lawsuit. The Commission has presented no convincing evidence that it has ever had a formal policy for determining which roads should be paved. The Commission has formulated no written guidelines or criteria; the Engineering Department has collected no data and submitted no recommendations. The closest approximation of a paving policy is a list of roads kept by the Commission, compiled on a "first come, first served" basis from citizen requests. No road is added to the list, of course, without the Commission's approval. The selection process, then, is highly subjective and highly susceptible to racial bias, purposeful or not. Even granting that the paving done since 1974 was pursuant to a rational policy, however, the statistics as of November, 1977, reflect a continuing disparity in treatment by race.

The county recreation program constitutes less than one percent of the budget. Its operation, however, reflects an attitude of callous disregard for the black community that is not likely confined to this one program. While the Commission does not withhold recreational opportunities from the black community altogether, it supplies such opportunities unequally and, most significantly, on a segregated basis. It should be settled by now that, within our constitutional framework, a governmental body that enforces segregation cannot be deemed responsive to black citizens.

Significantly, the county recreation program is segregated in its administration as

---

2. Black households are approximately 25 percent larger than white households. Census

Tracts, 1970 Census of Population and Housing, Alabama, PHC(1), 136.

well as in its operation. The Commission has hired Felix Norman, a white man, as county recreation director. His assistant, John McDade, is black. Norman supervises the white program; McDade, the black. Even the report that goes to the Recreation Board describes the white and black programs separately. Norman outlines the white program and McDade, the black. The two men do not collaborate; the two sections are stapled together to make one report.

The Commission operates a dual recreation system by offering its programs through community centers, which are private and segregated. There are seven white community centers and four black. The evidence shows that the commissioners and the county recreation employees are well aware of the racial identity of the community centers. It would be a mistake to assume that because these centers carry the same title they enjoy the same facilities. While, for example, all white centers have swimming pools, only one black center, Mt. Meigs, has a pool. The black Macedonia center has a "mud hole" in which the children try to swim. The black Pine Level "center" consists of nothing more than a trailer.

The children's activities' program is segregated. Like the county swimming program, it is provided through the segregated community centers. The county has also sent employees to supervise games and hobby activities at three other sites: the segregated South Montgomery Academy, the white Dublin Friendship Church, and the Ramer Civic Club Park. Predictably, only white children have attended at these locations. McDade was never requested to seek black participation at other than the black centers. The result is that in a large part of the county no supervised children's programs are available to blacks.

Felix Norman, the county recreation director, organized a white basketball league whose games are played at the segregated Hooper Academy. The county pays for the officials. There is no black basketball league. Norman testified that his black assistant, John McDade, requested funds to set up a black league but nothing was done. Norman never invited black teams or players to join the established league. Some money was appropriated in 1977, but a black league has yet to materialize. Defendants argue that it is not county policy to initiate programs, but only to cooperate when solicited for help. The record suggests that where whites are concerned exceptions are made. Even if that were not the case, a policy of passivity predictably operates to favor the white community.

There is a boys' and men's softball league for whites only. Norman has invited no blacks to participate and most of the games are played at the white community centers. The county supports a dual softball program for women. The county did not organize the leagues, but it furnishes umpires and some equipment. The county furnishes similar support to the Dixie Youth Baseball program, which was apparently desegregated in reaction to the Supreme Court's decision in *Gilmore v. City of Montgomery*, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). The county claims that it supports the Chisholm Softball League, which is desegregated. But the official county recreation program does not mention the league. In this area, too, the county has tailored its program to service primarily the white community.

The Court finds that the county has sponsored a limited number of one-time events, which have been desegregated. These have included a ride on the riverboat, the rental of a skating rink, a fishing rodeo, and trips to the zoo, Rebel baseball games, and Six Flags Over Georgia. Several of these projects were federally funded, however, necessitating that the monies be spent in a non-discriminatory manner. These efforts are at best ambiguous indicators of the Commission's responsiveness.

In simple terms, the county recreation program is both separate and unequal. Had these facts been presented twenty years ago, they would have occasioned little surprise. Offered as current practice, they represent startling proof that the Commis-

sion is little more responsive to the black community now than it was twenty years ago.

### C. State Policy for At-Large Districts

The historical record reflects that single and multi-member districting have both been widely used in Alabama's counties. Various counties have shifted from one system to the other, and sometimes back again. At the time Act 685 was passed, the number of counties using each system was roughly equal. The Court notes that Judge Pointer found the state policy behind at-large districting to be tenuous, and that his finding was not challenged on appeal. *Nevett II*, 571 F.2d at 227. The Court concludes therefore that there is no clear-cut state policy either for or against multi-member districting on at-large elections in the State of Alabama, considered as a whole.

### D. Past Racial Discrimination

The Court need not review the evidence showing that Montgomery County suffers from the effects of past discrimination so as to preclude effective black participation in the political process. The Fifth Circuit approved the adequacy of this finding, and nothing has changed since that time to modify the Court's conclusion. *Hendrix*, 559 F.2d at 1270.[3]

### E. The Enhancing Factors

The Montgomery County at-large scheme involves a majority vote requirement and precludes single-shot voting. In addition, the county is a large district. The average county governing district has a population of 47,848. Montgomery County's population of over 167,000 puts it in the 95th percentile. All three factors operate in plaintiffs' favor.

There is a geographic subdistrict requirement that ostensibly is in defendants' favor. However, as a reading of *Zimmer* makes clear, whether the existence of a subdistrict requirement is in favor of an at-large system depends upon the nature of the subdistricts. *Zimmer* derived the subdistrict requirement from its reading of *Whitcomb v. Chavis* and *White v. Regester*.[4] In *White*, the Supreme Court notes that the absence of subdistricts meant that "all candidates may be selected from outside the Negro residential area." 412 U.S. 755, 766, 93 S.Ct. 2332, 2340, 37 L.Ed.2d 314 (1973). The existence of subdistricts only enhances the likelihood that black candidates will be successful or that black influence will be effectual if at least one subdistrict is overwhelmingly black. That is not the case in either of Montgomery County's two southern districts. The subdistrict requirement here does not enhance black political participation.

### F. The Aggregate of the Factors

Having considered all relevant factors, the Court reaches the following conclusions: (1) that, while candidate slating is open, access to the political process, more broadly considered, remains restricted for black citizens for intermeshing historical and socio-economic reasons; (2) that the Commission's failure to involve a significant number of blacks in county affairs by hiring and appointment, its inconsistent performance in the provision of equal services, and its acquiescence in and perpetuation of segregated folkways and practices establishes its unresponsiveness to the black community; (3) that the state policy toward at-large systems is neutral, and (4) that past dis-

---

**3.** Defendants argue that the percentage of blacks registered has gone from 44.2 to 68.38 and that blacks now represent 27.4 percent of the county's registered voters. These new figures are not reliable. Defendants arrived at the figure 68.38 by comparing the number of black voters as of 1976 against the population base as of 1970 rather than against the larger population base of 1976. The percentage 68.38 is therefore considerably inflated. Moreover, de-

fendants' figure for the current number of registered black voters is suspect. In answer to plaintiffs' original interrogatories, defendants admitted that the race of over 7,000 registered voters was unknown. The total of 24,000 black voters has apparertly been reached by treating all of those 7,000 voters as black.

**4.** *Zimmer*, 485 F.2d at 1305 n.21.

crimination continues to have a detrimental effect on present political participation by blacks. Thus two factors strongly argue that the at-large plan is constitutionally deficient; a third provides support for that result, and the fourth is neutral. None of the primary factors weighs in favor of the plan. That three, if not four, of the enhancing factors point to the same conclusion is decisive. The Court's conclusion is based on more, though, than the mere arithmetic of the factors. The most critical factor, that of responsiveness, cuts in plaintiffs' favor. The demonstrable effects of past discrimination, in turn, influence the access factor in plaintiffs' favor. The Court is mindful of the caution required when constitutional claims bring the federal judiciary face to face with state authority in the exercise of a traditional legislative function. But the Court must not and will not refrain from taking appropriate action when the state cancels or dilutes the equal vote guaranteed to every citizen as a fundamental right. The Court therefore holds that Montgomery County's at-large election system unconstitutionally devalues the black vote.

The Court will enter declaratory and injunctive relief accordingly. Plaintiffs and defendants will be required to devise and submit revised apportionment plan(s) for the Court's consideration. Adherence to the clear directive of the Supreme Court requires that such plan(s) must prefer the use of single-member districts. *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978); *East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). The Court notes, however that "reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt." *Wise v. Lipscomb*, 437 U.S. at 539, 98 S.Ct. at 2497. The Court therefore emphasizes that, if the Legislature of the State of Alabama reapportions Montgomery County within 180 days of this date and secures approval of the plan by the Attorney General of the United States as required by Section 5 of the Voting Rights Act, the Court will consider that reapportionment plan.