CANTON BRANCH, NATIONAL ASSO-
CIATION FOR the ADVANCEMENT
OF COLORED PEOPLE, an Unincorpo-
rated Association, Tom Alexander, Sam
Young, Walter Caldwell, and Wilbert
Robinson, Individually and on behalf of
all others similarly situated, Plaintiffs,

v.

CITY OF CANTON, MISSISSIPPI, Harry
S. Baldwin, Mayor, Earnest A. (Gus)
Kraft, Phillip Buffington, J. D. Maness,
Glynn L. Cook, Earl B. Goolsby, Sr., H.
B. Cooper and Ernest Perkins, Alder-
men, Individually and in their official
capacities as Members of the Board of
Aldermen of the City of Canton; City of
Canton Municipal Democratic Executive
Committee, Charles Riddell, Chairman
of the City Democratic Executive Com-
mittee, City of Canton Municipal Elec-
tion Commission, R. H. Shackleford, Jr.,
Dr. George Carmichael and William B.
Crawford, Members of the City Election
Commission, Defendants.

Eugene HINTON, Eddie G. Akins, Robert
S. Mizell, James N. Stewart, Robert Tay-
lor, Larry Saxton, Individually and on
behalf of all others similarly situated,
Plaintiffs,

v.

Harry BALDWIN, Mayor of the City of
Canton, Mississippi, Phillip Buffington,
J. D. Maness, Glynn Cook, Earl B. Gools-
by, H. B. Cooper, Ernest Perkins and
Earnest A. Kraft, Jr., Aldermen of the
City of Canton, Mississippi, Election
Commissioners of the City of Canton,
Mississippi, and the Democratic Execu-
tive Committee of the City of Canton,
Mississippi, Defendants.

Civ. A. Nos. J77–0136(R), J77–0129(N).

United States District Court,
S. D. Mississippi,
Jackson Division.

Memorandum Opinion Sept. 25, 1978.

On Petition For Adjudication of
Compliance March 5, 1979.

G. M. Case, Case, Montgomery & Smith-Vaniz, Canton, Miss., Thomas J. Ginger, Frank R. Parker, Michael A. Middleton, Jackson, Miss., for plaintiffs.

R. L. Goza, Canton, Miss., Edward Blackmon, Jr., Blackmon, Smith & Nichols, Canton, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

In these two cases the Court is asked to consider the constitutionality of a municipal form of government, commonly called a voter dilution case, and to fashion an appropriate remedy if a constitutional infirmity is found to be present. The city involved in this case is Canton, Mississippi, the County Seat of Madison County, Mississippi, and two aspects of this litigation distinguish it somewhat from the usual case of this na-

ture. First is the fact that a group of white citizens of Canton, as well as a group of black citizens, have challenged the constitutionality of the present form of municipal government. Second is the fact that blacks comprise a majority of Canton's total population as well as a majority of its voting-age population.

*Hinton v. Baldwin*, was filed April 22, 1977 as a class action on behalf of all citizens and registered voters of Canton challenging the apportionment of its municipal wards and alleging a violation of rights guaranteed by the Fourteenth and Fifteenth Amendments and 42 U.S.C. §§ 1971, 1973 and 1983. *Canton Branch, National Association for the Advancement of Colored People v. City of Canton, Mississippi*, was filed April 28, 1977 as a class action on behalf of all residents and registered voters of Canton and all black residents and black registered voters of Canton challenging apportionment of the municipal wards and alleging a dilution of black voting strength in violation of the rights secured to them by the Constitution and laws of the United States. In their suit the *Hinton* plaintiffs sought a preliminary injunction to stop the city from holding the municipal primary election of May 10, 1977 or any other election utilizing the wards then in effect in Canton, and this Court granted this injunction on May 2, 1977, by agreement of the parties, enjoining the defendants from conducting or holding any further municipal primary or general elections for members of the Canton Board of Aldermen on the basis of the wards then in existence until the case could be adjudicated on the merits. On May 3, 1977, pursuant to F.R.Civ.P. 42(a), the *NAACP* plaintiffs filed a Motion to Consolidate their case with the action brought by the *Hinton* plaintiffs on the ground that both actions involved a common question of law and fact, and by agreement of all parties the two cases were consolidated for trial on their merits. Subsequent to the consolidation we ruled that both cases could be maintained as class actions on behalf of a class consisting of all citizens and registered voters of the City of Canton and that insofar as the issue of

dilution of black voting strength in the proposed plans for the city were concerned, the *NAACP* class might represent a class consisting of all black citizens and all black registered voters of the City of Canton. On July 5, 1977 by agreement of all the parties the Court entered a partial summary judgment declaring that the six wards then in use in the City of Canton for the election of members of the Board of Aldermen violated the one man-one vote guarantee of the United States Constitution, permanently enjoining the defendants from conducting or holding any further municipal primary or general elections under the existing ward population apportionment, and giving the parties the opportunity to submit to the Court within 120 days their views for quantitatively reapportioning the wards in the City of Canton in a constitutional manner.

The defendants have adopted and filed a plan with this Court reapportioning the wards of the City of Canton. The *Hinton* plaintiffs support the plan the defendants have adopted but the *NAACP* plaintiffs have filed objections to the defendants' plan, and have also filed their own plan, to which the defendants and the *Hinton* plaintiffs have objected.

The plaintiffs in the *Hinton* case are Eugene Hinton, Eddie G. Akin, Robert S. Mizell, James N. Stewart, Robert Taylor and Larry Thaxton, all citizens of the United States and registered voters of Canton, Mississippi. The *NAACP* plaintiffs are the Canton Branch of that unincorporated civil rights organization and Tom Alexander, Sam Young, Walter Caldwell, and Wilbert Robinson, all black citizens of the United States and residents and registered voters of Canton.

The defendant City of Canton, Mississippi is a municipal corporation organized under the laws of the State of Mississippi. Other than the defendant city which is sued only by the *NAACP* plaintiffs, all the defendants are the same in both cases. The defendants Ernest A. Kraft, Phillip Buffington, J. D. Maness, Glynn L. Cook, Earl B. Goolsby, Sr., H. B. Cooper, and Ernest Perkins are the aldermen of the City of Can-

ton. The defendant Canton Municipal Democratic Executive Committee is a body organized pursuant to the laws of the State of Mississippi and is charged under Miss. Code Ann. § 3152 (1956) with the responsibility of conducting municipal Democratic primary elections for the nomination of municipal officers. The defendant Charles Riddell is the chairman of the Canton Democratic Executive Committee. The defendant Canton Municipal Election Commission is a body organized under the laws of the State of Mississippi and is charged pursuant to Miss. Code Ann. § 21–11–13 (1972) with the responsibility for conducting municipal general elections in that municipality. The defendants R. H. Shackleford, Dr. George Carmichael and William B. Crawford are the members of the Canton Municipal Election Commission. All of these individual defendants are residents of the City of Canton.

The City of Canton is a code charter municipality as provided in Miss. Code Ann. § 21–3–1 (1972). The form of government which this authority requires can vary according to the population of the municipality, and according to the 1960 census Canton had a total population of 9,707 people. With this form of government and the population figure noted above, Canton up to and including the municipal election of 1961 elected five aldermen, one from each of four wards with one alderman elected from the city at-large. The authority for this procedure was Miss. Code Ann. § 3374–36 (1956), the predecessor statute of the present day statute which outlined the procedure noted above for code charter municipalities having a population of less than 10,000.

In 1962 the Mississippi legislature amended Miss. Code Ann. § 3374–36 (1956) [which is now Miss. Code Ann. § 21–3–7 (1972)] and as applied to Canton and other cities having less than 10,000 population in the 1960 census, required that one alderman live in each of the four wards, but that each alderman would be elected by the municipality at-large. The statute also required that in cities with more than 10,000 population in the last census, one alderman live in each of six wards, but be elected by the municipality at-large, with a seventh alderman living anywhere in the municipality and being elected from the municipality at-large.

The 1965 elections in Canton were not held in accordance with the 1962 amendment because of ignorance of its passage, but the primary and general elections of 1969 and 1973 were conducted pursuant to the amended statute, as was the 1974 special election. Prior to the date of the holding of the 1969 Democratic Municipal Primary in Canton, a group of black citizens filed an action in this Court seeking to enjoin the holding thereof because three changes in voting procedures had been made and not submitted to the United States Attorney General in accordance with the provisions of Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. After this Court granted a temporary restraining order enjoining the holding of the municipal election pending disposition of the case on the merits, the full three-judge court permitted the Canton elections to be held. *Perkins v. Matthews*, 301 F.Supp. 565 (S.D.Miss.1969). The 1969 municipal elections were then held in accordance with the 1962 amendments to the statute as outlined above. This decision was appealed to the United States Supreme Court, and that Court reversed this Court and held that the three changes—changes in polling places, annexations changing the number of eligible voters, and the 1962 amendments to the statute—were covered by Section 5 of the Voting Rights Act and could not be enforced until federal approval had been obtained. The Supreme Court, however, did not order new elections, but remanded that issue to this Court for determination of the appropriate remedy. *Perkins v. Matthews*, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). On remand this Court, again sitting as a three-judge court, then ordered a new election to be held in one ward. *See* 336 F.Supp. 6 (S.D.Miss.1971).

The 1970 census reflected that Canton had a population of 10,503 putting Canton over the dividing population figure of 10,-000 contained in the statute, which accounts

for its switching to the seven aldermen setup after that census.

In 1975 the election system in Canton was again affected by court action as a result of the decision in *Stewart v. Waller*, 404 F.Supp. 206 (N.D.Miss.1975). That case was an action brought by black citizens and registered voters of different Mississippi municipalities to have the court declare unconstitutional and enjoin the enforcement of Miss. Code Ann. § 21–3–7 (1972), the code section which embodied the 1962 amendments to Miss. Code Ann. § 3374–36 (1956) and required the at-large election of aldermen. The result of *Stewart v. Waller* was that Miss. Code Ann. § 21–3–7 (1972) was declared unconstitutional. In view of this finding of unconstitutionality, the court went on to declare that the statute law of Mississippi relating to aldermanic elections in effect prior to the passage of the unconstitutional statute was in full force and effect as if it had never been repealed or amended.

The result of *Stewart v. Waller*, as far as Canton was concerned, was that Canton was to be governed in accordance with the language of Miss. Code Ann. § 3374–36 (1956), a statute which required code charter cities of Canton's size to have seven aldermen. Under this seven aldermen arrangement the city should be divided into six wards with one alderman to be elected from each ward and one from the municipality at-large. Of course, in accordance with the language of the statute and the holding in *Stewart v. Waller, supra*, voting for each of the ward aldermen was to be confined to the residents of each particular ward.

With its electoral process in the posture outlined above, the city began to prepare for the 1977 municipal elections. By law those quadrennial elections for city officials were scheduled to be held on May 10, 1977 for party primaries, with any necessary runoff election in the primaries to be held on May 17, and the general election scheduled for June 7, 1977.

As the city approached the 1977 elections it found itself in a dilemma shaped by the court's decision in *Stewart v. Waller*, the provisions of Miss. Code Ann. § 3374–36 (1956), the United States Supreme Court's decisions formulating the one man-one vote principle, and the requirements of the Voting Rights Act of 1965. On one hand the court's action in *Stewart v. Waller* of implementing the requirements of the 1956 statute had forced the city to abandon at-large voting. On the other hand, however, the court-ordered return to ward voting presented the city with the problem of wards which were malapportioned under the one man-one vote requirements, although those wards could not be reapportioned in the absence of compliance with the Section 5 of the Voting Rights Act of 1965. The city recognized the necessity for redistricting its wards since the population of the several wards as constituted at that time unconstitutionally varied from the appropriate figure, and on February 15, 1977 the Mayor and Board of Aldermen adopted an ordinance redistricting the city by changing the boundaries of the several wards in an attempt to equally apportion their population. As required by Section 5 of the Voting Rights Act of 1965 the city submitted its redistricting ordinance to the Attorney General of the United States for approval. The Attorney General interposed an objection to this redistricting plan, thus making the plan unenforceable at that time. The objection, which was communicated to the city in a letter dated April 13, 1977, was premised on the fact that the city had possibly used inaccurate population figures for the population by race in its plan. At that point the city did not seek a reconsideration of the objection by supplying additional information, nor did it seek a declaratory judgment in the District Court for the District of Columbia that the redistricting plan would not have the purpose or effect of denying or abridging the right to vote on account of race or color. Shortly after the objection of the Attorney General was received, these suits were filed and the chain of events was set in motion that led to this Court enjoining the city from holding the 1977 elections and has brought this matter before the Court at this time.

After the parties had agreed that the existing ward structure of Canton was unconstitutional because of the malapportionment of the population, on June 2, 1977 the city hired the firm of Comprehensive Planners Incorporated to prepare a redistricting plan. On October 11, 1977, the resulting plan was presented to the Board of Aldermen and explained in detail by its preparers. At that time the Board of Aldermen, which includes two blacks, voted unanimously to adopt this plan as the reapportionment plan of the city, and the Minutes of that meeting reflect this action. (Exh. D–5).

### THE IMPACT OF WISE v. LIPSCOMB

■ The language of Section 5 of the Voting Rights Act of 1965 appears to cover any election law change, whether or not submitted to a court pursuant to court order as part of a lawsuit, when Section 5 recites that submission for federal review is required "Whenever a state or political subdivision [covered by the statute] shall enact or seek to [implement] . . ." any election law change. However in 1971 the United States Supreme Court carved out an exception for court-ordered election law changes when in *Connor v. Johnson*, 402 U.S. 690, 691, 91 S.Ct. 1760, 1761, 29 L.Ed.2d 268 (1971) it held that "a decree of the United States District Court is not within [the] reach of Section 5 of the Voting Rights Act." Likewise, in *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 638 fn.6, 96 S.Ct. 1083, 1085 n.6, 47 L.Ed.2d 296 (1976), the Supreme Court held that "court-ordered plans resulting from equitable jurisdiction over adversary proceedings are not controlled by Section 5." Since all political subdivisions covered by the Voting Rights Act must submit changes in their election laws to federal scrutiny unless the election law change is court-ordered, the threshold question becomes: What is a court-ordered plan?

Until very recently the leading case dealing with this inquiry was *East Carroll Parish School Board v. Marshall, supra*. The holding of that case was interpreted to mean that a reapportionment plan would be treated as a court-ordered plan when "submitted and adopted by the legislative body pursuant to court action." This interpretation, however, was rejected in large part in the recent United States Supreme Court decision in the case of *Wise v. Lipscomb*, 434 U.S. 935, 98 S.Ct. 2493, 56 L.Ed.2d 57 (1978). In *Wise* the district court struck down as unconstitutional the at-large election of city council members in Dallas, Texas and afforded the city the opportunity to submit a remedial plan. The city then adopted a plan which provided for the election of three city council members at-large and eight from single-member districts. The plaintiffs in that case who represented the black voters of Dallas also submitted two plans to the court. The district court approved the city's plan and ordered it into effect for the 1975 Dallas City Council elections. *Lipscomb v. Wise*, 399 F.Supp. 782 (N.D.Tex.1975). On appeal, the United States Court of Appeals for the Fifth Circuit reversed the lower court, holding that the city's plan was a court-ordered plan and should therefore utilize single-member districts exclusively. *Wise v. Lipscomb*, 551 F.2d 1043 (5th Cir. 1977). The Supreme Court disagreed with the Court of Appeals, and held that the plan was not subject to the more stringent standards governing court-ordered plans, but rather was a legislative plan which should be governed by the principles applicable to legislatively-enacted plans.

■ Under the Supreme Court's ruling in *Wise* there is no doubt that the plan adopted by the Canton Board of Aldermen and submitted to this Court is a legislatively-enacted plan. Prior to the institution of this Court action the city had recognized the need to bring its wards into line with the one man-one vote requirements and had tried to do so. As noted above this attempt was thwarted by the Attorney General and court action intervened at that point. The October 11, 1977 resolution of the Canton Board of Aldermen is analogous to the action of the Dallas City Council in passing a resolution stating an intention to enact the

form of government which was ultimately upheld by the Supreme Court. As the Court in *Wise* found important, this plan is "a legislative judgment, reflecting the policy choices of the elected representatives of the people . . ." In addition there is no doubt that the defendants were acting pursuant to a constitutional state statute since the court in *Stewart v. Waller, supra,* had declared that statute in effect. Not only do these conclusions alter the standards which will be applied in measuring the constitutionality of certain aspects of the form of government Canton will ultimately utilize, but they also raise the question of the impact of the Voting Rights Act of 1965 on this plan. In *Wise v. Lipscomb* the Supreme Court discussed this issue as follows:

> A new reapportionment plan enacted by a State, including one purportedly adopted in response to invalidation of the prior plan by a federal court, will not be considered "effective as law," *Connor v. Finch, supra,* 431 U.S. 407, at 412, 97 S.Ct. 1828, 52 L.Ed.2d 465; *Connor v. Waller,* 421 U.S. 656, 95 S.Ct. 200, 44 L.Ed.2d 486 (1975), until it has been submitted and has received clearance under § 5. Neither, in those circumstances until clearance has been obtained, should a court address the constitutionality of the new measure. *Connor v. Finch, supra; Connor v. Waller, supra.*

In light of this language of the United States Supreme Court the course this Court must follow at this time is clear. The lower federal courts have been instructed by the Supreme Court not to "address the constitutionality" of legislatively-enacted reapportionment plans of political bodies subject to Section 5 of the Voting Rights Act until those plans have been submitted to the federal authorities for pre-clearance as required by that statute. In this case the city's ward structure was attacked by the *Hinton* plaintiffs on the basis of malapportionment and by the *NAACP* plaintiffs both on that ground and dilution of black voting strength. However the directive of the Supreme Court in *Wise* was that this Court should refrain from examining the constitutionality of Canton's legislatively-enacted plan until it has been submitted to the federal authorities pursuant to Section 5 of the Voting Rights Act, and the Supreme Court did not qualify this command by limiting it to only certain types of unconstitutionality claims. Therefore regardless of the grounds upon which the plan is claimed to be unconstitutional, this Court must refrain from adjudicating the merits of this case until the city has submitted its newly enacted plan to the federal authorities in compliance with Section 5 of the Voting Rights Act. When a final resolution of that issue has been reached the Court will then address the claims of the plaintiffs, which will be ripe for adjudication at that time.

An Order conforming with this Memorandum Opinion, staying action in this cause until the defendant's plan has been submitted to the Attorney General in accordance with Section 5 of the Voting Rights Act of 1965, will be submitted in the time and in the manner provided in the Local Rules of this Court.

## ON PETITION FOR ADJUDICATION OF COMPLIANCE

This case is now before the Court for consideration of the city defendants' Petition for Adjudication of Compliance with the Court's Order of September 28, 1978, and for Final Judgment on the Merits. The history of these consolidated actions is set out in detail in the Memorandum Opinion of the Court dated September 28, 1978, wherein the Court recounted the history of the form of city government in Canton, viewed the plan promulgated by the defendants as a legislatively-enacted plan and ordered the defendants to submit that plan to the Attorney General of the United States for consideration under Section 5 of the Voting Rights Act of 1965. The Court's view of the city's plan as a legislatively-enacted plan has since been bolstered by the reasoning of the Court of Appeals in *Calderon v. McGee,* 584 F.2d 66 (5th Cir. 1978).

In accordance with this Court's directions, the defendants on or about October 14, 1978 submitted their legislatively-enacted plan to the Attorney General of the United States for his consideration, and by letter of December 15, 1978, the Justice Department announced that it did not interpose any objection to the defendants' redistricting plan. The *Hinton* plaintiffs have filed an answer to the defendants' Petition in which they aver that the defendants have complied with all of this Court's directions, all of the requirements of Section 5 of the Voting Rights Act of 1965, and all other statutory and constitutional requirements in formulating an acceptable redistricting plan, and urge its approval by the Court for use in electing the municipal government for the City of Canton.

The defendants' plan was prepared by the firm of Comprehensive Planners, Incorporated (CPI), a planning, research and development firm located in West Point, Mississippi. This firm was hired to prepare a plan for the city on June 2, 1977 after it became apparent that the ward structure then in existence did not comply with the one man-one vote requirements, and instructed to reapportion the city's population among six wards in order to meet all legal and constitutional guidelines. This firm has formulated a number of redistricting plans, including twenty-two in federal court actions, and all but one of these plans passed constitutional muster.

Robert Hardy, the Executive Director of CPI in West Point, explained how the plan was developed. The first step was to obtain all the 1970 Census Data for the city, and then make a house count of all occupied residences in the city, and classify them according to whether they were occupied by blacks or whites. This information was necessary because of the age of the 1970 Census figures, and the difference in the housing factor for black and whites. This housing factor is the average number of individuals living in a single dwelling unit. The calculation revealed a total as of August 1, 1977, of 12,741 people in Canton, 4,811 white, or 37.75%, and 7,930 black, or 62.25%. Using these figures, Hardy drew a map showing the white and black houses in each block, then divided the city into six wards with equal population of approximately 2,124 persons.

The resulting ward plan is described in detail in Exhibit D–4, and is summarized by population level below:

| Ward | Population | % of Total | % Variance from Ideal |
|------|-----------|-----------|-----------------------|
| 1 | 2,106 | 16.53 | 0.85 – |
| 2 | 2,130 | 16.72 | 0.28 + |
| 3 | 2,130 | 16.58 | 0.52 – |
| 4 | 2,131 | 16.73 | 0.33 + |
| 5 | 2,126 | 16.69 | 0.09 + |
| 6 | 2,135 | 16.75 | 0.52 + |
| Total | 12,741 | 100.00 | |

The other statistics for the defendants' plan, as well as the statistics for the *NAACP* plaintiffs' plan, are contained in the various exhibits admitted as evidence in this case.

It is readily apparent that the plan satisfies the most stringent one man-one vote requirements, since the maximum total deviation is 1.37%, and none of the individual deviations is over 1%.

A Census Enumeration District (ED) is the smallest census unit for which statistical data is available. In Canton there are 11 complete EDs and part of another, all generally designed to contain from 350 to 425 dwelling units. Once the number of white occupied and black occupied dwellings in each ED was known, it was possible to make an accurate estimate of the population of Canton by applying the housing factor for each ED to the number of houses in that particular ED to get that ED's population figure, then totaling the population of the EDs to get a total figure for the entire city.

Hardy stated that Canton is unusual in that all the whites live in the eastern section of town while all the blacks live in the western section of town, with little mixing of the races.

The factors Hardy considered in drawing this plan were, most importantly, the equal-

ization of population, the compactness of the wards, the maintenance of easily recognizable and historical boundaries, and the preservation of neighborhoods. In response to a question by counsel for the *NAACP* plaintiffs, the witness stated that he did not give any consideration to the residence of the present aldermen, which he had no knowledge of until the plan was drawn. After the plan was presented to the Board of Aldermen and explained in detail, all of them including the two black aldermen, voted to adopt it. One of the black aldermen even seconded the motion to adopt the plan.

The plan fairly apportions the population of the city among the six wards as fairly as could be done. Hardy stated he tried not to break up the heavy black concentrations in the northwest part of the city.

Most significantly, when asked whether his plan enhanced or diluted black voting strength, Hardy answered that the plan obviously enhanced black voting strength, pointing out that the black citizens in Canton are a sizable majority in both overall population and voting age population. This advantage operates to afford them an excellent chance to elect a candidate of their choice as the mayor and the at-large alderman. In addition, since the new plan almost assured the black population of being able to elect a candidate of their choice in Wards 4, 5 and 6, it obviously enhanced black voting strength because under the old plan only two blacks were elected. Under the *NAACP* plan the black voter would only be able to vote for two officials on the council, the mayor and the alderman in his ward, whereas under the defendants' plan the black voter could vote for his ward alderman, the alderman at-large, and the mayor. The Court agrees wholeheartedly with this analysis by the witness Hardy, and finds that the plan proposed by the defendants has the effect of enhancing voter participation and access of the black citizens in Canton, rather than diluting that influence.

The *NAACP* plaintiffs have not responded to the Petition of the defendants, but in earlier proceedings in this case these plaintiffs objected to the city's proposed plan on several grounds. These objections were (1) contrary to the rule that single-member districts are preferred in court-ordered plans, the defendants' proposed reapportionment plan provides for six aldermen to be elected from wards, one elected at-large, rather than for all to be elected from single-member districts; (2) defendants' proposed plan dilutes black voting strength by packing as many black voters as possible into only three proposed majority black wards which are all over 97% black; (3) defendants' proposed reapportionment plan fails to follow well-recognized natural and historical boundaries, such as Peace and Liberty streets; (4) defendants' proposed reapportionment plan would perpetuate an existing intentional denial of access by minority group members to the political process; (5) defendants' proposed reapportionment plan has the purpose and effect of discriminating against black voters on the basis of race; (6) defendants' population statistics for each ward, for each race in each ward, for all of Canton, and for each race in all of Canton, are incorrect; and (7) such other reasons as may be assigned at the hearing of the case.

In our prior Memorandum Opinion we recognized the authority of *Wise v. Lipscomb,* 434 U.S. 935, 98 S.Ct. 2493, 56 L.Ed.2d 57 (1978), holding this Court should refrain from examining the constitutionality of a legislatively-enacted plan until pre-clearance had been obtained from the Attorney General under Section 5 of the Voting Rights Act. However, since that pre-clearance has now been obtained the time is ripe to examine the defendants' plan and the *NAACP* plaintiffs objections thereto.

The rule referred to by the *NAACP* plaintiffs in their first objection, that single-member districts are preferred in court-ordered reapportionment plans, is not applicable to the city's plan in this case, for reasons which were developed in our previous Memorandum Opinion. We are not formulating the remedial relief of a court-ordered reapportionment plan at this time,

but are only considering whether to approve a legislatively-enacted plan produced by the duly elected governing officials of the municipality in question. In developing this plan the city followed a statutory scheme of government for the City of Canton which has not been declared unconstitutional, and which in fact was imposed upon the city by court action in *Stewart v. Waller,* 404 F.Supp. 206 (N.C.Miss.1975). Therefore, the adoption of a seven ward plan sponsored by the *NAACP* plaintiffs is appropriate only if they have proved that the city's present statutory plan, and notably the election of an at-large alderman, works an unconstitutional dilution of black votes in Canton. This they have failed to prove. *Wallace v. House,* 538 F.2d 1138 (5th Cir. 1976); *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

The *NAACP* plaintiffs' second objection to the city's plan is that it dilutes black voting strength by packing as many black voters as possible into only three proposed majority black wards which are all over 97% black. However, they have proposed a plan which had two wards 100% black in total and voting age population, two wards over 80% black in total and voting age population, and two other wards with both total populations and voting age populations of over 90% white. The fact that both plans included districts with large black majorities is directly attributable to what all witnesses at the hearing admitted, that the black population of Canton is densely concentrated in the northwest part of the city. Therefore, large segments of the black population must be included in the same wards if those wards are to have any semblance of symmetry and compactness. In fact, splitting this large compact black area among many wards would make the plan vulnerable to an allegation of racial gerrymandering. As will be developed below, the testimony of the witnesses for the defendant, which is supported by the figures involved in the city's plan, refute any charge that the plan is an effort to "pack" black voting

strength into a small number of wards. The *NAACP* plaintiffs have not adduced any specific evidence to show that there has been an effort by the defendants to concentrate the black vote in Canton, and in light of the fact that their expert, Dr. Murray, testified that the voting age population of a ward must be in excess of 60% black before a black has a chance of winning an election, it is hard to see how the *NAACP* plaintiffs can complain of high percentages of blacks in these wards. At any rate, a redistribution of the black population such as the *NAACP* plaintiffs seem to desire would only reduce the chance for a black candidate to win office, and would generate serious problems with the one man-one vote requirement.

The third objection by the *NAACP* plaintiffs to the defendants' plan was that it failed to follow well-recognized natural and historic boundaries, such as Peace and Liberty streets. There is no evidence to support this allegation, and merely saying it does not make it so. On the contrary, Hardy testified that the local historical boundaries were an important consideration in formulating the city's plan, and that the boundaries of the old wards were examined to ascertain just what these boundaries were. He concluded that the defendants plan had an "excellent" relationship with historical ward boundaries. On the other hand, the witness Holland pointed out an instance in the *NAACP* plaintiffs' alternative plan in which there was no boundary supplied for a section of a ward, and another place where the boundary was a drainage ditch. In summation the Court finds that this mere allegation by the plaintiffs has not been proved and thus this objection has no merit.

The fourth objection, that the defendants plan would perpetuate an existing intentional denial of access by a minority to the political process, and their fifth objection, that the plan has the purpose and effect of discriminating against black voters on the basis of race, will be considered together. Once a redistricting plan is shown to carry forward intentional and

purposeful discriminatory denial of access which may already be in effect, the plan cannot pass constitutional muster. *Kirksey v. Board of Supervisors of Hinds County,* 554 F.2d 139 (5th Cir. 1977) (en banc) *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). In their brief the *NAACP* plaintiffs state that because of the fact the Court entered a partial summary judgment in this case, the *NAACP* "plaintiffs have made no effort to prove intentional and purposeful discriminatory denial of access in Canton." However, the only reason for our granting the partial summary judgment was that the wards then existing violated the one man-one vote requirements, which all parties recognized, and which was not opposed by the defendants. Thus this action in no way affected the plaintiffs burden of proving a denial of access.

In their Proposed Findings of Fact and Conclusions of the Law the *NAACP* plaintiffs state "it is clear, and black plaintiffs do not argue otherwise, that black citizens can now register, vote, and qualify as candidates in party primaries and as Independents in general elections, without racial discrimination." There could be no valid opposite contention in light of the uncontradicted testimony of Charles Riddell, a member of the Municipal Democratic Executive Committee in Canton, who explained the qualification procedures for candidates and testified the slating procedure was open to all candidates, regardless of race.

The city clerk, Wanda Baldwyn, testified that she registered all voters, regardless of race, and that all races were able to vote, attend City council meetings and seek action from city departments in response to any complaint they might have. Any complaint concerning city services or the lack thereof was referred to the appropriate department head and treated uniformly for black and white citizens of Canton. This witness went on to detail a number of programs the City of Canton participates in which primarily benefit the black population, including the Meals-on-Wheels program, the Council on Aging, the Red Cross, the Madison General Hospital, the Canton Ambulance Service, and providing office space for the Food Stamp office without charge.

This review of the evidence shows that the *NAACP* plaintiffs did not prove a perpetuation of an existing intentional denial of access to minority group members. The *NAACP* plaintiffs fifth objection that the city's plan has the purpose and effect of discriminating against black voters on the basis of race has no evidentiary support, and in fact no real effort was made to prove this charge.

As their sixth ground for objecting to the city's plan, the *NAACP* plaintiffs state that the defendants' population statistics for each ward, for each race in each ward, for all of Canton, and for each race in the entire City of Canton are incorrect. Once again the charge is simply not supported by any evidence, and in fact the plaintiffs' own figures are the set of figures which have shortcomings.

The *NAACP* plaintiffs seven ward plan was prepared by the witness Henry Kirksey, who sought to qualify as an expert in the field of reapportionment and the preparation of redistricting plans. This witness had a degree in economics from North Carolina Central University, and his only qualification for his claimed expertise was experience during World War II as a field artillery officer, which the witness stated required a high degree of map familiarity. Mr. Kirksey used the house count figures for Canton developed by Mr. Hardy, that is, the number of black occupied houses and the number of white occupied houses, and then applied the housing factor for the City of Canton as a whole to these figures to get the total black and white population of Canton. However, as has been noted above, the available housing factor for each ED used by Mr. Hardy to arrive at his population figures is much more reliable for the following reasons.

The main reason is the basic principle of statistics and mathematics that a specific figure is more accurate than a general figure, and thus the housing factor for each

ED will give a more accurate picture of the population of that ED when applied to the number of dwellings therein than will Kirksey's use of the housing factor for the city as a whole. The above principle is even more relevant to the City of Canton because in the 1970 Census, ED 17 was inadvertently omitted from the Census though it was part of the city at that time. Hoyt Holland of C.P.I. testified that the housing factor for the white dwellings in Canton varied from ED to ED in a range of 2.0 to 5.0, and the housing factor for black dwellings varied from ED to ED in a range of 3.33 to 5.43. With this great degree of variance among the individual EDs, it was far more accurate to use the housing factor for the specific ED when trying to arrive at a population figure therefor.

Kirksey tacitly acknowledged this fact when he stated he had tried but was unable to obtain the housing factor for each ED, although both Hardy and Holland testified the information was readily available from the Census Summary Tape Center at Mississippi State University. Holland testified that when the housing factor for each ED was inserted into Kirksey's plan, instead of housing factors for the city as a whole, the variances from the ideal population were found as high as + 15.16% to −15.50%, or a total variance of 30.66%, which of course is completely outside constitutional guidelines.

The Court does not question the accuracy of the figures that the defendants used, and finds that the figures and calculations used by Mr. Kirksey were clearly shown to be erroneous. In addition we agree with Mr. Holland that the *NAACP* plaintiffs' plan constitutes a deliberate attempt to maximize black voting strength by creating four wards in which a black would assuredly be elected, assuming the black electorate would only vote for a black.

█ The next question before the Court is whether the election of an at-large alderman works a dilution of the black vote in Canton. The principles governing a claim of dilution were examined at great length by this Court in *Kirksey v. City of Jackson, Mississippi*, 461 F.Supp. 1282 (S.D.Miss.

1978) (appeal pending). In *City of Jackson* we noted that the case of *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc) *aff'd per curiam on other grounds sub nom, East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), is the leading case on this question, and had set out certain criteria which a trial court must address in deciding the question of dilution. Thus the factors which are seen to go primarily to the ultimate issue of dilution are (1) access to the political process, such as slating candidates; (2) responsiveness of representatives to the particular needs of the complaining minority; (3) presence or absence of a tenuous state policy in favor of at-large districting; and (4) existence of past discrimination that precludes effective participation by a minority in the electoral process. Those factors which may enhance the underlying dilution, if any, are (a) the size of the district in question; (b) the portion of the vote necessary for election (majority or plurality); (c) whether positions are contested for individually, and the number of candidates for which an elector must vote (anti-single shot voting provisions); and (d) whether candidates must reside in geographic sub-districts. These principles were confirmed by the Court of Appeals in the four voting dilution cases of *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978); *Bolden v. City of Mobile, Alabama*, 571 F.2d 238 (5th Cir. 1978), *prob. jurisdiction noted* 439 U.S. 815, 99 S.Ct. 75, 58 L.Ed.2d 106 (1978); *Blacks United, Etc. v. City of Shreveport*, 571 F.2d 248 (5th Cir. 1978); and *Thomasville Branch of N.A.A.C.P. v. Thomas City, Ga.*, 571 F.2d 257 (5th Cir. 1979).

Dr. Murray testified that there was bloc voting in Canton, with whites voting for white candidates and blacks voting for black candidates. However, as outlined above, there is no contention that there is any discrimination in the slating of candidates, and all parties admit that any person, regardless of his race, faces no impediment in qualifying to run for office in Canton or in registering to vote in Canton. This was

confirmed by the testimony of the plaintiffs' witness, Walter Caldwell, a black resident of Canton, who stated he knew of no instance of racial discrimination in these areas, and agreed that blacks were able to register to vote, vote and run for office in the exact same manner as all white citizens were. Caldwell did not know of anyone who had attempted to run for office and had been refused, and this witness acknowledged that from 1969 forward any candidate who wanted to run for office could qualify and run. He went on to note that blacks had run in every Democratic primary and general election in Canton since 1969, and although no black had been elected Mayor or alderman at-large, Caldwell stated that he did not know of any reason for this fact.

As noted above, the witness Murray stated that he found bloc voting in Canton, but he admitted he could not tell from statistics what motivated the voters to vote for the candidate or candidates of their choice. Murray stated that issues in the election, the personalities of the candidates, their experiences and their personal popularity, had no place in his analysis. Thus Murray ignored every traditional measure of a candidate's appeal to the electorate for their support in making his analysis. He had no proof that in any instance the voters did not vote for the candidate of their choice. He could not say that a black candidate would never be successful in a city-wide race, and could offer no reasons to support such a contention. Murray did not have the figures available for the number of white registered voters and black registered voters who voted in the 1969 or 1973 elections, and was not aware at the time he made his analysis that the black registered voters in Canton outnumbered the white registered voters both in 1973 and presently.

After reviewing this evidence the Court finds that the plaintiffs have failed to prove any lack of access in the election process in Canton, either in slating, registering or voting.

As this Court noted in *City of Jackson, supra,* a tenuous state policy in favor of at-large voting may constitute evidence that other, improper motivations lay behind the enactment or maintenance of the plan. However in this case, as we explained in our previous Memorandum Opinion, the present form of government in Canton is the result of previous court action, and therefore the Court cannot find any evidence of motivation from its enactment. It would be manifestly unjust to view the present form of government as indicative of an intent to discriminate when the electoral system is the result of federal court litigation. Thus, although we are unable to say that there is any extant state policy favoring or responsible for the at-large aldermanic post in Canton, we cannot find any unlawful purpose therefrom because of its origins noted above. It is appropriate to note at this point that the court in *Bolden v. City of Mobile, Alabama, supra,* recognized that city-wide representation was a legitimate interest, and at-large posts were ordinarily an acceptable means of preserving that interest.

The Court has to determine the existence of past discrimination that precludes effective participation by a minority in the electoral process. In this regard the *NAACP* plaintiffs submitted Exhibits P–12, P–13, P–14 and P–15. Exhibit P–12 is the opinion of the court in *Anderson v. The Canton Municipal Separate School District,* 10 Race Relations Reporter 1092 (S.D.Miss.1965), in which the court enjoined the defendants from operating a racially segregated school system and directed them to submit a plan for integrating the Canton public schools. To that opinion is attached the stipulation entered into by the city officials and the plaintiffs in that action to the effect that the plaintiffs' objections to the desegregation plan were withdrawn. Exhibit P–13 is a court opinion in *Thomas v. Canton, Mississippi Fire Department,* Civil Action No. J75–151(R) (S.D.Miss.1977), in which the fire department in Canton was charged with racial discrimination in employment opportunities. The two named plaintiffs were ordered hired and the fire department ordered not to discriminate on the basis of race.

Exhibit P–14 is the Consent Decree entered into in the case of *Miller v. Canton, Mississippi Police Department*, No. J75–144(N) (S.D.Miss.1975), in which the parties agreed that the employment practices of the defendants would be reduced to writing. The language of the Consent Decree specifically states that "the Defendants and each of them specifically deny engaging in any practice or procedure in terms and conditions of employment by its police department, which have the purpose or effect of discriminating against blacks or which violates said Title VII of the Civil Rights Act of 1964; that the Defendants' consent to this order is not in anywise to be construed as an admission by the Defendants or as a finding by the Court of any such past discriminatory practices or procedure in employment on the part of the Defendants, and this order shall not be used in any manner as evidence of the same, either in this or in any other proceeding." Taking the language of this Consent Decree at its face value, and noting the fact the attorney for the plaintiffs in *Miller* is also one of the attorneys representing the *NAACP* plaintiffs in this suit, and thus aware of its provisions, the Court views the Consent Decree as having no evidentiary value whatsoever.

Exhibit P–15 is the Consent Decree in *Goodlaw v. Baldwin*, Civil Action No. J75–29(C) (S.D.Miss.1977), a suit alleging racial discrimination by the City of Canton regarding the provision of municipal services and facilities. The Consent Decree entered in that action stated that:

> without the admission of any acts of discrimination or the admission of the truth of any allegations of the complaint, the parties have consented to the entry of the Consent Decree, which decree shall constitute no evidence of any unlawful act or omission on the part of the defendants.

In that Consent Decree the defendants agreed to make certain improvements, but again, as the Decree itself recites, the mere fact this action was filed is no proof of any discrimination by the defendants. In fact, the testimony of Weldon Tyner, the city engineer, which was uncontradicted, was that the city was in the process of making those improvements before the suit was filed, but was delayed by a tornado which struck Canton in the interim.

This Court is well aware of the requirements of the Court's decision in *Kirksey v. Board of Supervisors of Hinds County, supra*, that:

> Once plaintiffs established a past record of racial discrimination and official unresponsiveness which required the conclusion that at least until a short number of years past they had been denied equal access to the political processes of the county, it then fell to the defendants to come forward with evidence that enough of the incidents of the past had been removed, and the effects of past denial of access dissipated, that there was presently equality of access.

554 F.2d at 144.

Here the plaintiffs have made no prima facie showing, other than their proofs that the public school system was desegregated by court action in 1965, which is fourteen years ago, and that two blacks were able to prove a case of employment discrimination against the Canton Fire Department, although the court did not find or allude to any pattern of racial discrimination. This Court does not view the foregoing as significant enough to prove a past history of official unresponsiveness and racial discrimination requiring the conclusion that at least until a short number of years ago the blacks in Canton had been denied equal access to the political processes of the city.

Nevertheless, the defendants have come forward and proved that there is presently equality of access to the political system in Canton. As noted above, the evidence is uncontradicted that blacks have, without any impediment, been able to register and vote and qualify for office for the past ten years. The record is completely devoid of any evidence which would compel a conclusion that up until a short number of years past blacks had been denied access to the political process in Canton. There is no suggestion that there is not a unitary school

system in Canton at this time, complete integration of all public facilities, and absence of racial discrimination in or by the city. The city officials have put on evidence which is more than sufficient to rebut the allegation of present inequality of access, as will be outlined below. As the court said in *Nevett v. Sides, supra,* the NAACP plaintiffs "clearly had the burden of coming forward with evidence of past racial discrimination that precludes the effective participation of blacks in the electoral process today." 571 F.2d at 227. The only evidence the *NAACP* plaintiffs have produced is the four court actions examined above, two of which specifically state that the court action and the result therein shall constitute no evidence of any kind of discrimination. This is completely insufficient, and does not approach the level of proof the en banc court in *Kirksey v. Board of Supervisors of Hinds County, supra,* found to be present in Hinds County.

Finally, the *NAACP* plaintiffs have also wholly failed to prove that the city government in its present form is unresponsive to the needs of the black community. The court has described the issue of responsiveness in voter dilution case as "momentous," *Blacks United v. City of Shreveport, supra,* at 254, and the resolution of this issue has "considerable probative force on the question [of] whether the plan is being purposefully maintained" for the purpose of diluting black voting strength. *Id.* at 254. The primary evidence offered in this area by the *NAACP* plaintiffs, other than the results of the four court actions reviewed above, was the result of what the Office of Revenue Sharing in the U.S. Department of the Treasury called a "compliance review of the City of Canton's employment policies and practices, and delivery of municipal services." Exhibit P–16(A). This report recited that "the review disclosed the following discriminatory policies and practices:" and then enumerated a list describing the results of the review. The conclusion of the Office of Revenue Sharing was that Canton must bring itself into compliance with the Office's requirements or suffer suspension of further payment of Revenue Sharing

funds. Subsequently, in a follow-up letter dated February 28, 1977, Exhibit P–16(B), the city was informed that the actions it had proposed to satisfy the Office of Revenue Sharing were not "sufficient" and that revenue sharing funding to Canton was to remain suspended. This letter was followed by a letter of January 12, 1978, Exhibit P–16(C) in which the city was again taken to task by the Office of Revenue Sharing and informed that its payments would remain suspended.

Although there is no question that these documents, comprising Exhibit P–16, are admissible as an exception to the hearsay rule under F.R.Evid. 803(8), this does not enhance their credibility, or compel the Court to give them undue weight. We are not willing to abdicate our duty as the finder of fact under F.R.Civ.P. 52(a) to this federal agency.

This so-called compliance review is certainly not the best evidence of the existence of conditions it purports to reveal. The *NAACP* plaintiffs had every opportunity to produce the same evidence for the Court that the officials from the Office of Revenue Sharing ostensibly relied upon in making their decision in these areas. There is no indication of the timeliness of the review, that is, whether the city officials were given the opportunity to prepare for the review and to compile favorable evidence, or evidence which would contradict that used by the Office of Revenue Sharing in preparing their report. There is no indication of any special skill or experience on the part of these officials which convinces the Court to give their findings or conclusions weight, or any other evidence before the Court of the reliability of the review. The Court has not been informed of the motivation, if any, of the officials that conducted this review, or been informed whether a hearing was held to permit the city to present its case and to dispute the facts or evidence relied upon by the Office of Revenue Sharing. Obviously the city does not silently acquiesce in the conclusions contained in the review, since Exhibit P–16(C) contains the statement "The City denies

that they discriminate in the provision of recreational equipment and improvements" but this contention was summarily rejected by the Office of Revenue Sharing as "inadequate" without explanation or justification. The Court, as the finder of fact, places little reliance upon the compliance review as accurate analysis of the state of affairs in the city government of Canton. These reports are similar in evidentiary nature to investigative reports prepared by the EEOC, although we feel they are much less reliable than the EEOC reports, which are in no sense binding upon the Court and in no way alter the duty of the Court to decide the ultimate issue before it. *See Smith v. Universal Services, Inc.*, 454 F.2d 154 (5th Cir. 1972).

 Lastly, and most importantly, shortly after the trial of this cause, the defendants received a letter from the Office of Revenue Sharing which stated that the actions taken by the defendant were considered adequate by that agency to bring the city within the criteria established by the Office of Revenue Sharing, and therefore the payments to the city under the Act were being resumed. This letter is dated March 16, 1978, and if we were inclined to view the conclusions reached by the Office of Revenue Sharing as having much probative value, the response of the Office of Revenue Sharing to the city's actions would seem to be equally probative that the problems found by that federal agency were in large measure cured or are in the process of being cured. The question of whether to permit re-opening of the record to allow the defendants to introduce this letter in evidence is within the sound discretion of the Court. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331–332, 91 S.Ct. 795, 28 L.Ed.2d 77 (1972); 6A *Moore's Federal Practice* 59.04(13) (2nd Ed.1974). Since this case was tried to the Court and the letter was received shortly after the conclusion of the trial, we are of the opinion that the interest of justice and fairness require that the letter be admitted into evidence. Therefore the letter will be admitted and marked Exhibit P–16(D).

The witness William Grissett was a specialist in police department operation and had worked closely in assisting the police departments in Mississippi to obtain LEAA grants. He had made a personal inspection of the Canton police department to determine if any discriminatory conditions existed and had found none. This testimony was not contradicted by any witness the *NAACP* plaintiffs produced.

The city engineer of Canton testified that race played no factor in deciding when streets should be asphalted or otherwise maintained. This witness explained in depth that the city was in compliance with the language of Exhibit P–15, and had only been delayed prior to the time the suit was filed because of the tornado which struck Canton. This witness testified unequivocally that no services were available to white residents of Canton that were not equally available and provided to the black citizens of Canton.

John Wallace, the manager of the Canton Municipal Utilities, testified that his agency handled complaints from black and white citizens in the same manner, and that race had no bearing on the operation of the utility services in Canton. Wallace stated that his department was responsive to the needs of all citizens, and that race had no effect upon the utility service the customer received.

The testimony of these witnesses was not disputed by the *NAACP* plaintiffs except by the documents issued by the Office of Revenue Sharing. The Court views this report of findings by the Office of Revenue Sharing as inherently unreliable and accords it little weight as evidence of unresponsiveness by the city government to the needs of the black citizens of Canton. Furthermore, the weight the Court feels this report should get is reduced even more by the letter from the Office of Revenue Sharing which restores the payments to the city. Our duty in determining whether the city is unresponsive is peculiarly a factual one, to be determined from all the evidence of record. A review of this evidence convinces this Court that not only have the *NAACP*

plaintiffs failed to meet their burden of proving that the city government is unresponsive to the needs of its black citizens, but that the city has satisfactorily proved to the Court that there is no discrimination in the provision of municipal services and that it is responsive to the needs of all its citizens.

The criteria which may enhance the underlying dilution are (a) the size of the district, (b) the portion of the vote necessary for election, (c) whether there is an anti-single shot voting requirement, and (d) whether the candidates must reside in geographical subdistricts.

In this case the district is large in the sense that the at-large representative is elected from the entire city, but this conclusion is lessened in importance by the fact that Canton is a relatively small community, smaller than Fairfield, Alabama, which was the subject town in *Nevett v. Sides, supra. David v. Garrison*, 553 F.2d 923, 927 (5th Cir. 1977) noted that the size of the at-large district was important in considering the constitutionality of the system, and since Canton is such a small municipality the Court cannot envision any difficulty on the part of the electorate with becoming familiar with the at-large candidates.

There is a majority vote requirement in Canton, and there is an anti-single shot rule. There is not any requirement that the candidate for the at-large seat reside in any of the wards; however, candidates for an aldermanic seat from a particular ward are required to live in the ward they seek to represent.

Although two and possibly four of the enhancing factors are present in this case, the Court cannot discern any underlying dilution for these factors to operate upon. Therefore their presence is of little value to the *NAACP* plaintiffs.

## SUMMARY AND CONCLUSION

The Supreme Court has expressly rejected the contention that at-large elections are unconstitutional merely because fewer minority candidates may be elected, due to polarized voting, than the minority's portion of the district population. *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). Therefore the *NAACP* plaintiffs' often stressed fact that a black has never won an at-large election in Canton is not sufficient in itself to prove an unconstitutional dilution. No circumstantial evidence that the plan was enacted with discriminatory intent can be gathered from the historical background of the defendant's plan, since that plan is the result of court action, as has been noted above. *See Nevett v. Sides, supra* at 222. Nor is the defendant's plan an instrumentality for carrying forward a pattern of purposeful and intentional discrimination, as the court found in *Kirksey v. Hinds County Board of Supervisors, supra*. It is obvious that the defendant's plan is not a neutral plan in enactment which is now being used as a vehicle for ignoring black interests.

After examining all the factors the Court of Appeals has directed the district courts to consider and decide in actions where voter dilution is alleged, this Court is obligated to determine in whose favor the evidence predominates. In this inquiry the Court has paid special attention to this language from *Nevett v. Sides:*

> That the finder of fact determines the plaintiff has prevailed under one or even several of the *Zimmer* criteria may not establish the existence of intentional discrimination. *See, e. g., McGill v. Gadsden County Commission*, 535 F.2d 277 (5th Cir. 1976). The evidence under the other criteria may weigh so heavily in favor of the defendant that the evidence as a whole will not bear an inference of invidious discrimination. Of course, the plaintiff need not prevail under all of the criteria, *Zimmer*, 485 F.2d at 1305, nor is he limited to them. The task before the fact finder is to determine, under all the relevant facts, in whose favor the "aggregate" of the evidence preponderates. This determination is peculiarly dependent upon the facts of each case. It comprehends "a blend of history and an intensely local appraisal of the design and impact of the [at-large] district in the

light of past and present reality, political and otherwise." *White v. Regester*, 412 U.S. [755] at 769–70, 93 S.Ct. [2332, 37 L.Ed.2d 314] at 2341. It is the obligation, therefore, of the finder of fact carefully to examine and weigh the competing factors to determine whether the coincidence of those probative of intentional discrimination is sufficient. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." [*Village of*] *Arlington Heights [v. Metropolitan Housing Development Corp.*], 429 U.S. [252] at 266, 97 S.Ct. [555, 50 L.Ed.2d 450] at 564.

571 F.2d at 224–25 (footnotes omitted)

■ Keeping in mind this admonition, we weighed the *Zimmer* factors "in the aggregate" and find it clear that the *NAACP* plaintiffs have not proved an impermissible dilution of black votes under the defendants' plan. The *NAACP* plaintiffs did not prove a lack of access to the political process. They did prove the existence of a tenuous state policy in favor of at-large voting, but the evidence is somewhat mixed in this respect since the present Canton form of government was the result of court action. The Court has not found the existence of past discrimination that precludes effective participation by the minority in the electoral process, so this factor has not been proven. Finally, the Court has found that the *NAACP* plaintiffs have clearly not proved a lack of responsiveness of the city government to the needs of the black citizens in Canton.

Thus the *NAACP* plaintiffs have proven only one of the primary *Zimmer* factors, and even when enhanced by two, possibly four of the enhancing factors, this Court views the proof under the primary factors as insufficient in the aggregate to establish a case of dilution. Accordingly, there will not be an impermissible dilution under the defendants' legislatively-enacted plan calling for the election of one at-large alderman. The parties stipulated that prior to the 1973 elections in Canton, 54.39% of the registered voters were black, and 45.61% were white, and that the percentages in Canton at this time are approximately the same as they were in 1973. Therefore, assuming that the black voters of Canton are committed to voting only for a black candidate in an at-large election in that city and disregarding all considerations of qualifications, personal popularity and effectiveness of campaigning, it appears that the heretofore failure of black candidates to win an at-large election is merely a function of losing elections, and does not flow from any constitutionally impermissible source. *Cf. United Jewish Organization v. Carey*, 430 U.S. 144, 166 fn. 24, 97 S.Ct. 966, 1010, 51 L.Ed.2d 229 (1977). This especially so in light of the open access to the political system the Court has found blacks in Canton to possess.

The language of the United States Supreme Court in *Wise v. Lipscomb, supra*, is appropriate to note at this point:

The Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt. *Conner v. Finch*, 431 U.S. 407, 414–415, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Gaffney v. Cummings*, 412 U.S. 735, 749, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Burns v. Richardson*, 384 U.S. 73, 84–85, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan. The new legislative plan, if forthcoming, will then be the governing law unless it, too, is challenged and found to violate the Constitution. 'A state's freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection

Clause.' *Burns v. Richardson, supra,* at 85, 86 S.Ct. 1286.

In this case the existing ward structure was recognized by all parties as violating the one man-one vote doctrine. In response to this unconstitutional situation, the city government drew up a new plan, which the above language from *Wise* indicates must be given a measure of deference as the product of the duly elected representatives of the people of Canton. In this case this plan must be the "governing law" unless it is challenged and found to be unconstitutional. The defendants' plan was challenged, but as the Court has outlined above, no constitutional infirmity is present in the plan so it will be the governing law.

Under the facts of this case the *NAACP* plaintiffs have wholly failed to prove that the claimed dilution was the result of any invidious discriminatory purpose or intent. In addition, the Court finds that the defendants' plan meets all constitutional standards, both in regard to one man-one vote considerations, compactness, deference to historical boundaries, and symmetry, and is acceptable in all respects. Therefore the defendants are entitled to prevail in these suits and receive a Final Judgment in their favor dismissing this suit with prejudice at the cost of the *NAACP* plaintiffs. Prior to the submission of this Final Judgment, the defendants are ordered to present to the Court a suggestion of the most efficient and expeditious manner to implement their plan and to provide for elections thereunder.

Thereafter a Final Judgment, approved as to form by counsel for all parties, shall be submitted to the Court within the time and in the manner provided for in the Local Rules.